



**FILED**

SEP – 1 2006

U.S. DISTRICT COURT
BAY CITY, MICHIGAN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EUGENE CALABRESE, D.O. &
COLONY MEDICAL GROUP, PC,

     Plaintiffs,

vs.

ST. MARY'S OF MICHIGAN,
HEALTH PLUS OF MICHIGAN, INC.,
GEORGE ROLLER, M.D.,
FAITH ABBOTT, D.O.,
MEDLEY A. LARKIN, D.O.,
CHARLES JESSUP, D.O.,

Jointly and Severally,

     Defendants.

_____/

File No. 06-

Hon.

**06 - 1 3 9 0 8**

**JUDGE THOMAS L. LUDINGTON**

**MAGISTRATE JUDGE
CHARLES E. BINDER**

THE MASTROMARCO FIRM
BY: VICTOR J. MASTROMARCO, JR. (P34564)
Attorneys for Plaintiffs
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

_____/

There is no other pending or resolved civil action arising out
of same transaction or occurrence in the Complaint, either
previously filed or dismissed.

## COMPLAINT, DEMAND FOR JURY TRIAL
## AND DEMAND FOR PRE-TRIAL CONFERENCE

**NOW COMES** the Plaintiffs, EUGENE CALABRESE, D.O. and COLONY MEDICAL GROUP, PC, by and through their attorneys, THE MASTROMARCO FIRM, and hereby complains against the Defendants stating more fully as follows:

## COMMON ALLEGATIONS

### The Parties & Statement of Jurisdiction

1.  That at all times relevant herein, the Plaintiff, EUGENE CALABRESE, D.O., is a resident of Saginaw County, State of Michigan.

2.  That at all times relevant herein, the Plaintiff, Dr. Calabrese, is a physician licensed to practice in the State of Michigan and is an employee of Colony Medical Group, PC.

3.  That at all times relevant herein, the Plaintiff, COLONY MEDICAL GROUP, PC, is a Michigan Corporation doing business in Saginaw County, State of Michigan.

4.  That at all times relevant herein, the Plaintiffs' performed various medical procedures including, but not limited to, the following procedures at area hospitals internal medicine procedures, endoscopy procedures, noninvasive cardiology procedures and critical care management, and that prior to the termination of Dr. Calabrese's privileges he performed these procedures at St. Mary's of Michigan.

5.  Upon information and belief, the Defendant, ST. MARY'S OF MICHIGAN, is a Michigan Non-Profit Corporation doing business in Saginaw County, State of Michigan as a Hospital.

2

6.    Upon information and belief, the Defendant, GEORGE ROLLER, M.D., is a licensed physician who lives and does business in Saginaw County, State of Michigan.

7.    Upon information and belief, the Defendant, CHARLES JESSUP, D.O., is a licensed physician who lives and does business in Saginaw County, State of Michigan.

8.    Upon information and belief, the Defendant, FAITH ABBOTT, D.O., is a licensed physician who lives and does business in Saginaw County, State of Michigan.

9.    Upon information and belief, the Defendant, MEDLEY A. LARKIN, D.O., is a licensed physician who lives and does business in Saginaw County, State of Michigan.

10.    Upon information and belief, the Defendant, HEALTH PLUS OF MICHIGAN, INC., is a Michigan Non-Profit Corporation doing business in the County of Saginaw, State of Michigan.

11.    That the wrongful actions as alleged in this Complaint occurred in the County of Saginaw, State of Michigan.

12.    That this Court has Subject Matter Jurisdiction pursuant to 28 USC §1337, since the Plaintiffs bring this action under Section 4 of the Clayton Act (15 USC §4) to recover damages incurred as a result of violations by the Defendants of Section 1 of the Sherman Anti-Trust Act, (15 USC §1) and Sections 4 and 16 of the Clayton Act (15 USC §§4 and 16) to secure equitable relief against a continuation of those violations.

3

13.     The Court also has supplemental jurisdiction over Plaintiffs' state claims as well.

## Background Facts

14.     At all times relevant herein, Dr. Calabrese performs various procedures at area hospitals where he has privileges including, but not limited to, the following: internal medicine procedures, endoscopy procedures and critical care management.

15.     That Dr. Calabrese also performs the above-mentioned procedures at area hospitals where he has privileges on behalf of Colony Medical Group, PC, and that he is the only physician on staff at Colony Medical Group, PC who is able to perform the above-mentioned procedures.

16.     That before his privileges were suspended Dr. Calabrese performed the above-mentioned procedures at Defendant Hospital.

17.     That Plaintiffs' patients include residents from several states.

18.     That at all times relevant herein, the Defendants are all aware of the above-mentioned facts.

19.     As stated above, Dr. Calibrese's medical privileges with Defendant Hospital were summarily suspended on January 11, 2002.

20.     That the vague charges that were made against Dr. Calibrese are baseless, and the Defendants Hospital and Doctors know that the charges against Dr. Calabrese are baseless.

21.     That pursuant to Defendant Hospital's bylaws, the Plaintiff sought review of the decision.

4

22. That the matter was then submitted to an informal committee for review, and on January 31, 2002, an informal committee hearing was conducted on the summary suspension with the committee consisting of the following individuals; Dr. Medley A. Larkin, Dr. Faith Abbott, Dr. Don Cady, Dr. George Roller and Dr. Leroy Barry.

23. That Defendant Hospital failed to provide notice before the hearing as to the charges against Dr. Calabrese as required by Defendant Hospital's by-laws:

> The notice of hearing shall state in concise language the acts or omissions with which the practitioner is charged, a list of specific or representative medical records being questioned, and/or the other reasons or subject matter that was considered in making the adverse recommendation, preliminary decision or summary suspension.

(See 8.4.2 of bylaws - **Exhibit 1**).

24. The following members of the committee are in direct competition with Plaintiffs: Dr. Medley A. Larkin and Dr. Faith Abbott in that both provide the same treatments and procedures as the Plaintiffs at Defendant Hospital, and that both have special relationships with Defendant Hospital with Dr. Abbott's group having exclusive contract with Defendant Hospital and with Dr. Larkin being a landlord of Defendant Hospital.

25. Furthermore, Defendant Roller has a contract with Defendant Hospital and pursuant to his contract is responsible for referring patients that arrive at Defendant Hospital's ER.

26. That pursuant to Defendant Hospital's by laws (Article VIII), "No staff member who is in direct economic competition with the staff member requesting the

5

hearing shall be appointed to serve on the hearing committee." (See 8.5.1 of bylaws - **Exhibit 1**).

27.   That the presence of Drs. Larkin, Abbot and Roller on the hearing committee violated Defendant Hospital's by-laws.

28.   That the informal committee recommended that the termination of privileges be upheld.

29.   That despite the fact that Dr. Larkin recommended that the privileges be upheld, Dr. Larkin admitted to Dr. Calabrese, after the hearing, that the allegations against him were baseless.

30.   The matter was then submitted by Dr. Calabrese to an Appellate Review Committee.

31.   Despite a request by Dr. Calabrese, Defendant Hospital refused to disclose the identities of the members of the Appellate Review Committee.

32.   Like the ad hoc committee, pursuant to Defendant Hospital's by laws (Article VIII):

> No person who is in direct economic competition with the affected practitioner, nor any person who actively participated in the prior consideration of the adverse recommendation, preliminary decision or summary suspension regarding the affected practitioner, or any Hearing held with respect theretho, shall be appointed to serve on the Appellate Review Committee.

(See 8.7.4 of bylaws - **Exhibit 1**).

33.   The Appellate Review Committee upheld the removal of Dr. Calabrese's privileges, and on April 17, 2002, which was approved by the Governing Board

6

(upon which Sister Cuscurida sits as Chairperson), Defendant Hospital permanently ended Dr. Calabrese's medical privileges.

34. That the adverse action by Defendant Hospital was submitted by the Hospital to the National Practitioner Data Bank.

35. That following the submission to the Data Bank, the State Licensing Board for Michigan investigated Dr. Calabrese's actions (in the context of the alleged deficiencies as noted by the Hospital) and found Dr. Calabrese's actions to be appropriate.

36. On September 27, 2002, Dr. Calabrese sought an application for staff membership and privileges which was denied by Defendant Hospital on October 29, 2002.

37. On April 19, 2004, Dr. Calabrese again sought application for staff privileges with Defendant Hospital.

38. In a letter dated September 22, 2004, the Interim Vice President of Medical Affairs acknowledged receipt of the application and indicated that the following was needed in order to consider Dr. Calabrese's application:

> In order to consider your Application, the Credentials Committee, the Medical Staff Executive Committee, and eventually the Board of Directors will need written documentation of the clinical activities you have engaged in over the past 24 months and the remedial action (sic) have you taken to address the key issues identified in your suspension.

39. The Medical Staff Credentialing and Privileging Manual states the following as it pertains to the application process.

> (C) After the twenty-four (24) month waiting period, the practitioner may submit another application. The practitioner also must furnish evidence that the basis for the earlier adverse action no longer exists.

7

> In addition, such applications shall not be processed unless the practitioner submits satisfactory evidence that he has complied with the specific requirements any such adverse action may have included, such as completion of training or proctoring conditions.

(CPM 1.4.10 (C) (See **Exhibit 2**).

40. In other words, an application could be processed only if the practitioner submits satisfactory evidence that he has complied with the specific requirements any such adverse action may have included, such as completion of training or proctoring conditions.

41. A refusal to process is not an adverse action which is reportable to the National Practitioner Data Bank.

42. In response, Dr. Calabrese provided the information requested.

43. On or about June 27, 2005, the recommendation from the Credentialing Committee was mailed to Dr. Calabrese with the following comment:

> The basis for this decision is that you failed to provide sufficient evidence to support improvement or changes in the areas that previously resulted in your termination of medical privileges at St. Mary's.

(See Yelvington's 6/27/05 Letter - **Exhibit 3**).

44. Despite the fact that the Committee was only supposed to decide whether or not to process the application, the Committee went on and processed the application and then denied Dr. Calabrese's request for clinical staff privileges:

> This letter constitutes written notice of the Credentialing Committee's recommendation and support by the St. Mary's Medical Staff Board to deny your request for clinical privileges at St. Mary's Medical Center pursuant to the St. Mary's Medical Staff Bylaws.

(See Yelvington's 6/27/05 Letter - **Exhibit 3**).

8

45.     By processing the application and denying Dr. Calabrese's request for clinical privileges, Defendant Hospital had improperly issued a decision which was an adverse action and thus reportable to the National Practitioner Data Bank.

46.     That the Defendants Hospital and Doctors know that an adverse action is reported to the National Practitioner Data Bank, and that such a notation has an adverse affect on a physician's ability to obtain privileges. The Defendants Hospital and Doctors knew this in 2002 and they knew this in 2004-2005.

47.     In fact, Dr. Calabrese has experienced difficulty in obtaining medical privileges and joining (and renewing) with insurance companies.

48.     As a result of the adverse action, on August 31, 2005, the special meeting of the Joint Conference Committee of St. Mary's of Michigan Medical Center was held with the following individuals participating on the committee; Sister JoAnn Cuscurida, Jim VanTiflin, Dr. Charles Jessup, Dr. Bapindeedu Maganti, Dr. John Collins, Fleury Yelvington.

49.     That Sister Cuscurida's participation in the hearing violated Defendant Hospital's bylaws which forbids an individual's presence on the committee when that individual actively participated in the adverse recommendation in 2002. (See 8.5.1 of bylaws - **Exhibit 1**).

50.     That an objection was made with regards to Sister Cuscurida's participation at the hearing, but Dr. Calabrese's objections were ignored.

51.     The committee upheld the recommendation of the Credential's Committee at the conclusion of the meeting on August 31, 2005.

9

52.    That the improper nature of the Committee's ruling was then raised with the Appellate Review Committee.

53.    Following the submission of briefs by both Defendant Hospital and Dr. Calabrese, the Appellate Review Committee agreed that the Committee had issued an improper ruling and stated such in correspondence dated March 9, 2006:

> The Credentials Committee is hereby instructed to reverse its denial of Dr. Calabrese's Application and instead deem the Application incomplete for failure to submit sufficient evidence of improved behavior according to the Credentialing Manual. **The Credentials Committee is further instructed to advise Dr. Calabrese, in writing, of the documentation deemed necessary by the Credentials Committee to deem his Application complete within 30 days.** Should Dr. Calabrese fail to submit the requested information, the Application will remain in incomplete status. Should Dr. Calabrese submit the requested information in compliance with the requirements provided by the Credentials Committee, the Application shall be deemed complete and reviewed by the Credentials Committee in accordance with Medical Staff Bylaws and policies.

(See Meisel 3/9/06 Letter - **Exhibit 4**).

54.    Contrary to the above-mentioned directive from Appellate Review Committee, the Credentials Committee has knowingly and intentionally chosen not to comply with the directive to provide the information within 30 days and instead waited over four (4) months to advise Dr. Calabrese as to its demands on or about July 18, 2006, the substance of which requires Dr. Calabrese to provide a laundry list of information to Defendant Hospital the disclosure of which is unlawful and unethical, and these untimely and impossible demands constitutes further evidence in support of Plaintiff's claims that Defendants have acted unlawfully. (See Schell 7/18/06 Letter - **Exhibit 5**).

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197   (989) 752-1414

55. That the reason for Defendants Hospital and Doctors actions is that Defendant Hospital maintains in-house physicians who perform the same procedures as those previously provided by Dr. Calabrese and who are direct competitors of Dr. Calabrese and Colony Medical Group, P.C., and have contractual relationships with Plaintiffs' competitors and are allowing those individuals including the named Defendant Doctors to perform the procedures previously performed by Plaintiffs.

56. That Defendants Larkin, Abbott, Roller and Jessup are not employees of Defendant Hospital.

57. By denying Dr. Calabrese privileges, the Defendants Hospital and Doctors have not only prevented Dr. Calabrese from competing, but have also prevented Colony Medical Group, P.C. from competing, and the Defendants Hospital and Doctors are fully aware of this fact.

58. That many of Plaintiffs' patients have medical coverage which mandates that procedures be performed at Defendant Hospital and thus the denial of privileges has resulted in a situation where Plaintiffs' patients are forced to utilize physicians (other than the Plaintiffs) including the Defendant Doctors when having procedures performed at Defendant Hospital.

59. At all times relevant hereto, Plaintiffs and Defendants Hospital and Doctors transacted business further affecting commerce by treating a number of out of state patients, and receiving monies from Medicare, Medicaid, Champus, the Federal Office of Personnel Management (OPM), Health Care programs, Blue Cross/Blue Shield, Workers Compensation and various private third-party insurance

11

programs. Furthermore, Plaintiffs and the Defendants Hospital and Doctors purchased, used and sold products and services while engaged in the practice of medicine, including, but not limited to, the purchase of malpractice insurance, equipment and other materials which affect the flow of interstate commerce and which forms an integral part of the interstate distribution of such services and products which are manufactured, sold and flow in a continuous and uninterrupted stream of interstate commerce.

60.    That Defendants Hospital and Doctors have engaged in conspiratorial activities designed to ensure the cause of termination of Dr. Calabrese's hospital privileges and to ensure a lack of competition at Defendant Hospital in the areas previously performed by Plaintiffs.

61.    Dr. Calabrese areas of practice require the use of specialized equipment, documented training and experience at hospitals including Defendant Hospital.

62.    Because the Defendant Hospital has denied access to Dr. Calabrese, this has resulted in his exclusion from access to the market upon which he has specialized in the context of patients which have insurance requirements that mandate the use of Defendant Hospital.

63.    That Defendants Hospital and Doctors actions have caused Plaintiffs' patients to loose their right to choose whether to utilize Plaintiffs' services at Defendant Hospital.

64.    Defendant Hospital provides healthcare services and transacts business affecting the flow of interstate commerce. The Hospital also treats a substantial percentage

12

of the patients seeking the various procedures performed by Dr. Calabrese, and a substantial portion of those types of cases are sent to Defendant Hospital for treatment.

65. That prior to the termination of his privileges at Defendant Hospital, Dr. Calabrese treated patients who entered Defendant Hospital for treatment (i.e. the Emergency Room).

66. Defendants Hospital and Doctors were at all times relevant to this Complaint, in the business and profession of providing to the consuming public, services, facilities and items related to internal medicine procedures, endoscopy procedures, noninvasive cardiology procedures and critical care management at the Hospital, all of which involve and affect the flow of interstate commerce.

67. Defendant Hospital, its staff physicians, physicians with privileges including the named Defendants individually and in concert as part of a conspiracy, acted their own behalf pursuant to their interests which were independent of their affiliation with Defendant Hospital and which arose from their private practice of medicine.

68. These Defendants Hospital and Doctors benefited personally from their illegal contract, combination and conspiracy which is alleged herein. Defendants Hospital and Doctors conduct was, at all times, consistent with their independent interests. These Defendants Doctors presently continue their private practice in Saginaw County, Michigan and remain active members of the Hospital's staff with full medical staff privileges and continue to monopolize the market in the area of medicine specialized by Plaintiffs. The Hospital itself maintains an active and

13

busy medical service facility, through which patients are admitted for treatment in the areas upon which the Plaintiff has specialized.

69.    Prior to the illegal and anticompetitive conspiracy alleged herein, Plaintiffs enjoyed a prosperous practice. Due to Dr. Calabrese's skill and specialized training he received an increasing number of referrals from physicians in Saginaw and the surrounding counties in Michigan, thereby lowering revenues for the Defendants Hospital and Doctors who were his economic competitors.

70.    That Colony Medical Group, PC likewise benefited from Dr. Calabrese's skills and specialized training.

71.    In response to the competitive threat Plaintiffs posed to Defendants Hospital and Doctors, unfounded concerns about Dr. Calabrese (as set forth previously) which were made in an attempt to have Dr. Calabrese's privileges revoked by St. Mary's of Michigan. There was no factual basis to any of those concerns. Fearing competition from Dr. Calabrese, the Defendants Hospital and Doctors entered into a conspiracy with each other to monopolize, or attempt to monopolize the types of services previously performed by the Plaintiff at Defendant Hospital.

72.    Defendants Hospital and Doctors actions also manifested themselves in the form of a false and malicious peer review action against Dr. Calabrese in an illegal boycott against Dr. Calabrese calculated to cause and which did cause the loss of Dr. Calabrese's privileges at the Hospital from 2002 to the present day. Defendants continued their unlawful actions when they refused to follow mandated procedure when Dr. Calabrese sought reinstatement of his privileges in 2005.

14

73.     Pursuant to its own Bylaws, principles of fairness and due process, the Hospital
        was to conduct a balanced and reasonable review of the charges against Dr.
        Calabrese when his privileged were removed and was likely required by its own
        Bylaws, principles of fairness and due process to conduct a balanced and
        reasonable review in conformity with the mandated procedures when Dr.
        Calabrese sought reinstatement of his privileges.

74.     That Defendant Health Plus likewise has participated in the wrongful acts in that it
        has a close business relationship with Defendants.

75.     That Defendant Health Plus has knowingly threatened to revoke Colony Medical
        Group's use of Dr. Calabrese's services as an employee even though the use of Dr.
        Calabrese's services are authorized pursuant to the agreement which exists
        between Defendant Health Plus and Colony Medical Group.

76.     That Defendant Health Plus's efforts are in concert with Defendants actions in
        interfering with Plaintiffs' abilities to treat patients and is in furtherance of
        Defendants' intent to interfere with Dr. Calabrese's relationship with Colony
        Medical Group.

77.     That the purpose of Defendant Health Plus' actions is to help Plaintiffs'
        competitors with their advantage over Plaintiffs and to strengthen its relationship
        with the Defendants who it is believed have contacted Defendant Health Plus.

78.     While Dr. Calabrese's partner, Dr. Collette Mercier, at Colony Medical Group
        cannot perform the procedures previously performed by Dr. Calabrese at
        Defendant Hospital, Dr. Mercier does have privileges at Defendant Hospital to

15

admit and supervise the treatment of her patients at Defendant Hospital, and Defendant Health Plus' actions have effectively extended its prohibition of Dr. Calabrese's treatment of Dr. Mercier's patients at Defendant Hospital to Plaintiffs' treatment of Dr. Mercier's patients at her own office.

### COUNT I - VIOLATION OF SECTION ONE OF THE SHERMAN ACT AND SECTION FOUR OF THE CLAYTON ACT & THE MICHIGAN ANTITRUST REFORM ACT (Plaintiffs' claims against Defendants)

79.    The Plaintiffs hereby incorporates paragraphs 1 through 78 of their common allegations word for word paragraph by paragraph as if restated herein.

80.    That Defendant hospital was the final decision maker in deciding to suspend and terminate Plaintiff's privileges at Defendant Hospital and was the final decision maker in deciding not to grant and/or reinstate privileges at Defendant Hospital and thus is not entitled to immunity pursuant to the Supreme Court decision of Feyz, M.D. vs. Mercy Memorial Hospital, ___Mich___; ___NW2d___(June 24, 2006).

81.    That the Defendants and Defendant Hospital's staff physicians have conspired to inhibit trade and competition in violation of §1 of the Sherman Act, 15 USC §1, by engaging in an unlawful combination and conspiracy to blacklist and boycott Dr. Calabrese, by revoking his privileges without due process, by refusing to correct its earlier breach when a request for reinstatement was made and then later by refusing to follow its reinstatement procedures when Plaintiff has sought

16

reinstatement, and by threatening Colony Medical Group for its continued use of Dr. Calabrese's services.

82. Without Dr. Calabrese's services, Colony Medical Group, PC would not have a physician on staff that can perform various procedures at Defendant Hospital including, but not limited to, internal medicine procedures, endoscopy procedures and critical care management.

83. That Defendant Health Plus has further refused to permit Colony Medical Group, PC from utilizing Dr. Calabrese to cover for Dr. Collette Mercier when she has patients at Defendant Hospital and is prevented from seeing them despite the fact that Defendant Health Plus' contract with Colony Medical Group allows Plaintiff Calabrese to do so, and Defendant Health Plus' involvement in the unlawful actions by the other Defendants is illustrated, in part, by the fact that Defendant Health Plus carbon copied Defendant Hospital as to the personal and private communications between Defendant Health Plus and Plaintiffs.

84. Plaintiffs have suffered the type of injury the anti-trust laws were intended to prevent and that flows from that which makes the Defendants' acts unlawful. The injury reflects the anticompetitive effect either of the violation or of anti-competitive acts made possible by the violation.

85. Plaintiffs' injury and damages coincide with the public detriment tending to result from the violation. The effect of the conspiracy is a diminution in competition in the fields of internal medicine at the Hospital specifically and in the tri-city market. This is particularly true in light of the fact that managed care contracts are

17

in existence which require patients to see only certain doctors, and often limit the patients' choice to a select hospital. Thus, the consuming public that is part of a managed plan may not be able to use Dr. Calabrese and/or Colony Medical Group PC because their plan will not allow them to do so except at St. Mary's of Michigan.

86.   In addition, the decision to revoke Dr. Calabrese's privileges was a black mark on Dr. Calabrese's career, which he will always be required to disclose on health care related applications, and which will inhibit or prevent him from obtaining privileges in other hospitals.

87.   Dr. Calabrese's privileges were terminated by the Hospital as a result of false and malicious peer review. The competitive significance of Dr. Calabrese's exclusion from the Hospital must be measured, not just by the particularized evaluation of his own practice, but also by a general evaluation of the impact of the restraint on other participants and potential participants at the Hospital. After the elimination of Dr. Calabrese's privileges, Plaintiffs' competitors have filled the void created by Dr. Calabrese's inability to treat patients at St. Mary's of Michigan.

88.   Prior to the termination of his privileges, Dr. Calabrese performed many tests, for his patients along with patients being treated at St. Mary's, at St Mary's including, but not limited to, such things as echocardiograms, exercise tests, exercise or dobutamine echocardiograms, exercise nuclear studies, adenosine stress nuclear studies, pulmonary artery catheterizations, spinal taps, peg tube placements, colonoscopy and polypectomy, EGD's, transesophogeal echos, endotracheal

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414

intubation, chest tube placements and/or interventional work. Dr. Calabrese was trained in and performed each of these procedures.

89.  That St. Mary's of Michigan now seeks to have its own in-house physicians and specialists perform the duties previously performed by Dr. Calabrese along with other physicians of Defendant Hospital's choice (including the named Doctors) who have been given privileges.

90.  Due to Defendants wrongful actions, Dr. Calabrese is restrained in his ability to make his services readily and fully available to the public, and so is Colony Medical Group

91.  The termination of Dr. Calabrese's privileges has directly resulted in the denial of patients, depending on their insurance plans, from the opportunity to seek services from Dr. Calabrese and Colony Medical Group PC. As a matter of practical economies, there has been a reduction in the number of individuals providing the services, since Dr. Calabrese is no longer permitted to participate.

92.  As a direct and proximate result of the aforesaid combination and conspiracy, Dr. Calabrese and Colony Medical Group, PC have been forced to expend considerable sums of money which he would not have otherwise been required to spend due to the necessity of overcoming the illegal attempts by Defendants to deny Dr. Calabrese's right to practice at the Hospital.

93.  As a result of the unlawful activities to restrain trade and competition by the Defendants, Plaintiffs have been caused to suffer and will continue to suffer substantial damages to their reputation and practice all to their detriment.

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414

94.    The Defendants concerted efforts to eliminate Plaintiffs as a competitor constitutes a group boycott in violation of Section one of the Sherman Act. By eliminating Plaintiffs as a competitor, the boycott successfully reduced competition to the Hospital's in-house physicians who are now performing the procedures previously performed by Dr. Calabrese.

95.    That Plaintiffs have suffered damages in excess of $75,000.00. Plaintiffs are further entitled to three times the damages determined to have been sustained, simple interest on actual damages allowed by law, costs of suit and his reasonable attorney fees.

96.    The Defendants have monopolize or attempted to monopolize Dr. Calabrese's areas of practice in violation of 15 USC §1 and 2. The Defendants have attempted to restrain competition and inhibit trade, including the denial of competitive advantages or opportunities in violation of 15 USC §15 and 26.

97.    The Defendants have monopolize or attempted to monopolize Dr. Calabrese's areas of practice in violation of Michigan Law. See MCL §445.771 et seq. The Defendants have attempted to restrain competition and inhibit trade, including the denial of competitive advantages or opportunities in violation of Michigan Law. See MCL §445.771 et seq.

98.    Defendants have knowingly, willingly, and maliciously sought to destroy Dr. Calabrese and Colony Medical Group's reputation and medical practice in order to inhibit or restrain competition from Plaintiffs. Such conduct requires an award of

exemplary damages, treble damages and attorneys fees against the Defendants in order to discourage such conduct in the future.

99.    Plaintiffs are entitled to recover threefold the damages they have sustained, and the cost of suit, including attorney fees, pursuant to Section 4 of the Clayton Act. 15 USC §15 (1988). In addition, pursuant to Section 16 Plaintiffs seeks declaratory and injunctive relief as prayed for herein. 15 USC §26 (1988).

100.   The Plaintiffs further seek all damages and equitable relief awardable pursuant to the Michigan Antitrust Reform Act. See MCL §445.771 et seq.

**WHEREFORE,** the Plaintiffs pray that this Honorable Court enter judgment in their favor in an amount in excess of $75,000.00 to compensate them for all economic losses, and all non-economic losses, and punitive damages, and attorney fees along with all other relief awardable under law or equity.

### COUNT II - BREACH OF CONTRACT (Dr. Calabrese's claim against Defendant Hospital only)

101.   The Plaintiffs hereby incorporates paragraphs 1 through 78 of their common allegations and paragraphs 79 through 100 of Count I word for word paragraph by paragraph as if restated herein.

102.   That the Defendant Hospital has created through its by-laws certain detailed policies and procedures which physicians with privileges at St. Mary's of Michigan and those seeking to regain privileges at St. Mary's of Michigan are entitled. (See Attached by-laws - **Exhibit 1**).

21

103.   That it is firmly established that policies and procedures are binding upon employees and employers under the theory of legitimate expectations as well as Michigan Statute including MCL § 331.6.

104.   That Defendant Hospital through its by-laws have created certain policies and procedures which the Plaintiff has legitimately relied upon for maintaining his medical privileges as a member of Defendant Hospital's medical staff and for reinstatement of his medical privileges.

105.   That the policies and procedures contained within Defendant Hospital's bylaws promise security and further promise that privileges would not be revoked absent cause.

106.   That the policies and procedures contained within Defendant Hospital's bylaws likewise promise an application and appeal process.

107.   That Defendant Hospital in revoking Dr. Calabrese's privileges without cause have breached its policies and procedures, and in failing to follow its procedures when Dr. Calabrese challenged the suspension of his privileges.

108.   That Defendant Hospital, in subsequently failing to follow its policies and procedures when Plaintiff sought reinstatement of his privileges, has also breached those policies and procedures as well.

109.   That Defendant Hospital's policies and procedures on its face afford contractual, statutory as well as due process rights to members of its medical staff including Dr. Calabrese.

22

110.    That it is firmly established that an employer can be bound to its policies and procedures under a public policy basis of legitimate expectations and/or Implied in Fact Contracts.

111.    That Defendant Hospital in hiring and terminating its relationship with its medical staff is held to higher legal standards and obligations then other employers in the State of Michigan.

112.    That Defendant Hospital's actions during the process of revoking Dr. Calabrese's privileges were malicious in nature.

113.    That subsequent to revoking Dr. Calabrese's privileges the Defendant Hospital has been malicious in its refusal to reinstate Dr. Calabrese's privileges and in failing to afford Dr. Calabrese with the rights which Dr. Calabrese was entitled pursuant to its policies and procedures.

114.    As a result of the breach in policies and procedures, Dr. Calabrese has suffered economic losses in the form of lost income (past, present & future) from patients in an amount in excess of $75,000.00.

**WHEREFORE,** the Plaintiff, Dr. Calabrese, pray that this Honorable Court enter judgment in their favor in an amount in excess of $75,000.00 to compensate him for all economic losses, and attorney fees along with all other relief awardable under law or equity.

### COUNT III - TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY AND/OR CONTRACT
### (Plaintiffs' claims against Defendant Physicians)

23

115.  The Plaintiffs hereby incorporates paragraphs 1 through 78 of their common allegations and paragraphs 79 through 100 of Count I and paragraphs 101 through 114 of Count II word for word paragraph by paragraph as if restated herein.

116.  That the Defendants are fully aware of Plaintiffs contract and/or business relationship with Defendant Hospital and with Plaintiffs contract and/or business relationship with their patients.

117.  That Defendant's wrongful actions, as set forth above, have interfered with Plaintiffs' contract and/or business relationship with Defendant Hospital and with Plaintiffs' patients.

118.  That Defendants' wrongful actions are unjustified under any circumstances.

119.  That Defendants' wrongful actions have caused Plaintiff to loose patients and/or to loose income as a result of Plaintiffs' inability to perform procedures on those patients at Defendant Hospital.

120.  That Defendants' actions have resulted in economic damages (past, present & future).

121.  That Defendants actions have caused mental anguish, sleepless nights, nightmares and a severe disruption of Dr. Calabrese's lifestyle.

122.  That the Plaintiffs also seek all other applicable damages including attorney fees.

**WHEREFORE,** the Plaintiffs pray that this Honorable Court enter judgment in their favor in an amount in excess of $75,000.00 to compensate them for all economic losses, and all non-economic losses, and attorney fees along with all other relief awardable under law or equity.

24

## COUNT IV - TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY AND/OR CONTRACT
### (Plaintiffs' claims against Health Plus of Michigan)

123. The Plaintiffs hereby incorporates paragraphs 1 through 78 of their common allegations and paragraphs 79 through 100 of Count I and paragraphs 101 through 114 of Count II and paragraphs 115 through 122 of Count III word for word paragraph by paragraph as if restated herein.

124. That the Defendants are fully aware of Plaintiffs contract and/or business relationship with the area hospitals and with Plaintiffs contract and/or business relationship with their patients.

125. That Defendant's wrongful actions, as set forth above, have interfered with Plaintiffs' contract and/or business relationship with the area hospitals and with Plaintiffs' patients, because Defendant knows that without Dr. Calabrese's services, Colony Medical Group cannot service its patients at area hospitals.

126. That Defendants' wrongful actions are unjustified under any circumstances.

127. That Defendants' wrongful actions have caused Plaintiff to loose patients and/or to loose income as a result of Plaintiffs' inability to perform procedures on those patients at Defendant Hospital.

128. That Defendants' actions have resulted in economic damages (past, present & future).

129. That Defendants actions have caused mental anguish, sleepless nights, nightmares and a severe disruption of Dr. Calabrese's lifestyle.

130. That the Plaintiffs also seek all other applicable damages including attorney fees.

25

**WHEREFORE**, the Plaintiffs pray that this Honorable Court enter judgment in their favor in an amount in excess of $75,000.00 to compensate them for all economic losses, and all non-economic losses, and attorney fees along with all other relief awardable under law or equity.

## COUNT V - TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY AND/OR CONTRACT (Plaintiffs' claims against Hospital)

131.   The Plaintiffs hereby incorporates paragraphs 1 through 78 of their common allegations and paragraphs 79 through 100 of Count I and paragraphs 101 through 114 of Count II and paragraphs 115 through 122 of Count III and paragraphs 123 through 130 of Count IV word for word paragraph by paragraph as if restated herein.

132.   That the Defendants are fully aware of Plaintiffs contract and/or business relationship with Health Plus.

133.   That the Defendants Doctors and or Hospital have threatened Health Plus of Michigan causing Health Plus to take adverse action against Plaintiffs.

134.   That Defendant's wrongful actions, as set forth above, have interfered with Plaintiffs' contract and/or business expectancy with Health Plus.

135.   That Defendants' wrongful actions are unjustified under any circumstances.

136.   That Defendants' actions have resulted in economic damages (past, present & future).

137.   That Defendants actions have caused mental anguish, sleepless nights, nightmares and a severe disruption of Dr. Calabrese's lifestyle.

26

138.   That the Plaintiffs also seek all other applicable damages including attorney fees.

**WHEREFORE**, the Plaintiffs pray that this Honorable Court enter judgment in their favor in an amount in excess of $75,000.00 to compensate them for all economic losses, and all non-economic losses, and attorney fees along with all other relief awardable under law or equity.

Respectfully Submitted,

THE MASTROMARCO FIRM

Date: August 30, 2006          By: _____
                                         VICTOR J. MASTROMARCO, JR. (P34564)
                                         Attorney for Plaintiffs
                                         1024 N. Michigan, P.O. Box 3197
                                         Saginaw, Michigan  48605-3197
                                         (989) 752-1414

27

## DEMAND FOR PRE-TRIAL CONFERENCE

NOW COMES the Plaintiffs by and through their attorneys, The Mastromarco

Firm, and hereby demands a Pre-Trial Conference.

Respectfully Submitted,

THE MASTROMARCO FIRM

Date: August 30, 2006           By: _____
                                VICTOR J. MASTROMARCO, JR.  (P34564)
                                Attorney for Plaintiffs
                                1024 N. Michigan, P.O. Box 3197
                                Saginaw, Michigan 48605-3197
                                (989) 752-1414

## DEMAND FOR TRIAL BY JURY

NOW COMES the Plaintiffs by and through their attorneys, The Mastromarco Firm, and hereby demands a trial by jury of all issues in this cause of action unless expressly waived.

Respectfully Submitted,

THE MASTROMARCO FIRM

Date: August 30, 2006        By:

VICTOR J. MASTROMARCO, JR. (P34564)
Attorney for Plaintiffs
1024 N. Michigan, P.O. Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

29

| ARTICLE | TITLES | PAGE # |
|---|---|---|
| | 5.8.8 Status of Allied Health Professionals | 19 |
| | 5.8.9 Discipline for Dependent Allied Health Professionals (D.A.H.P.) | 19 |
| | 5.8.10 Professional Liability Insurance | 20 |
| | 5.8.11 Discipline for Independent Allied Health Providers | 20 |
| | 5.9 HOUSE OFFICERS | 20 |
| ARTICLE VI | CREDENTIALING AND PRIVILEGING PROCESSES | 22 |
| ARTICLE VII | CORRECTIVE ACTION | 23 |
| | 7.1 DISCRETIONARY INTERVIEW PRIOR TO CORRECTIVE ACTION | 23 |
| | 7.2 GROUNDS FOR ACTION | 23 |
| | 7.3 PROCEDURE | 24 |
| | 7.4 AUTOMATIC SUSPENSION/TERMINATION OF PRIVILEGES | 25 |
| | 7.5 LICENSE | 27 |
| | 7.5.1 Revocation | 27 |
| | 7.5.2 Drug Enforcement Administration (DEA) | 27 |
| | 7.5.3 Medical Records | 28 |
| | 7.5.4 Professional Liability | 28 |
| | 7.8 REMOVAL FROM OFFICE OF MEDICAL ADMINISTRATIVE OFFICER | 28 |
| | 7.8.1 General Manner of Removal | 28 |
| | 7.8.2 Statement of Grounds | 29 |
| | 7.8.3 Agreement on Grounds for Removal | 29 |
| | 7.9 REMOVAL OF ELECTED OFFICERS AND DEPARTMENT CHAIRMEN | 29 |
| ARTICLE VIII | HEARING AND APPELLATE REVIEW PROCEDURE | 30 |
| | 8.1 RIGHT TO HEARING AND TO APPELLATE REVIEW | 30 |
| | 8.2 NOTICE OF ADVERSE RECOMMENDATION | 30 |
| | 8.3 REQUEST FOR HEARING | 31 |
| | 8.4 NOTICE OF HEARING | 32 |
| | 8.5 COMPOSITION OF HEARING COMMITTEE | 32 |
| | 8.6 CONDUCT OF HEARING | 33 |
| | 8.7 APPEAL TO THE GOVERNING BODY | 35 |

| ARTICLE | TITLES | PAGE # |
|---|---|---|
| | SERVICES | |
| | 4.6.1 Exclusive Policy | 10 |
| | 4.6.2 Qualifications | 10 |
| | 4.6.3 Effect of Contract Expiration or Termination | 10 |
| | 4.7 MEDICAL ADMINISTRATIVE OFFICERS | 11 |
| | 4.7.1 Definition | 11 |
| | 4.7.2 Medical Staff Membership, Clinical Privileges & Membership Obligation | 11 |
| | 4.7.3 Effect of Removal from Officer Status or Adverse Change in Membership Status or Clinical Privileges | 11 |
| | 4.8 TEMPORARY LEAVES FROM THE MEDICAL STAFF | 12 |
| ARTICLE V | CATEGORIES OF THE MEDICAL STAFF | 13 |
| | 5.1 CATEGORIES OF THE MEDICAL STAFF | 13 |
| | 5.2 ACTIVE MEDICAL STAFF | 13 |
| | 5.2.1 Qualifications for Active Staff | 13 |
| | 5.2.2 Prerogatives of Active Status | 13 |
| | 5.2.3 Obligations of Active Staff | 13 |
| | 5.3 ASSOCIATE MEDICAL STAFF | 14 |
| | 5.3.1 Qualifications for Associate Medical Staff | 14 |
| | 5.3.2 Prerogatives of Associate Status | 14 |
| | 5.3.3 Obligations of Associate Status | 14 |
| | 5.4 AFFILIATE MEDICAL STAFF | 15 |
| | 5.4.1 Qualifications for Affiliate Status | 15 |
| | 5.4.2 Prerogatives of Affiliate Status | 15 |
| | 5.4.3 Obligations of the Affiliate Status | 15 |
| | 5.5 PROVISIONAL STATUS | 15 |
| | 5.5.1 Qualifications for Affiliate Status | 16 |
| | 5.5.2 Prerogatives of Provisional Status | 16 |
| | 5.5.3 Obligations of Provisional Status | 16 |
| | 5.5.4 Observation and Evaluation | 17 |
| | 5.6 EMERITUS MEDICAL STAFF | 17 |
| | 5.7 CONDITIONAL LIMITED | 17 |
| | 5.7.1 Qualifications | 17 |
| | 5.7.2 Prerogatives | 17 |
| | 5.8 ALLIED HEALTH PROFESSIONAL AFFILIATE STAFF (A.H.P.) | 18 |
| | 5.8.1 Defined | 18 |
| | 5.8.2 Qualifications | 18 |
| | 5.8.4 Standards and Criteria | 18 |
| | 5.8.6 Procedure for Appointment | 19 |
| | 5.8.7 Term and Appointment | 19 |

## Table of Contents

| ARTICLE | TITLES | PAGE # |
|---|---|---|
| PREAMBLE | | 1 |
| DEFINITIONS | | 2-3 |
| ARTICLE I | NAME | 4 |
| ARTICLE II | THE PURPOSES | 4 |
| ARTICLE III | ETHICS and ETHICAL RELATIONSHIP | 5 |
| ARTICLE IV | MEDICAL STAFF MEMBERSHIP | 6 |
| | 4.1 Nature of Membership | 6 |
| | 4.2 Qualification for/and Responsibilities of Membership | 6 |
| | 4.2.1 Licensure | 6 |
| | 4.2.2 Performance | 6 |
| | 4.2.3 Attitude and Professional Demeanor | 6 |
| | 4.2.4 Ethics | 7 |
| | 4.2.6 Health Status | 7 |
| | 4.2.7 Geographic Proximity | 7 |
| | 4.2.7 Professional Liability Insurance | 7 |
| | 4.2.9 Board Certification | 8 |
| | 4.2.10 Abide by Bylaws | 8 |
| | 4.2.11 Complete Medical Records | 8 |
| | 4.2.12 Continuing Medical Education | 8 |
| | 4.2.13 Arrange Coverage | 8 |
| | 4.2.14 Medical Center Ability to Accommodate and Community Needs | 8 |
| | 4.2.15 Equipment and Space | 8 |
| | 4.2.16 Emergency Coverage | 8 |
| | 4.2.17 Utilization | 8 |
| | 4.2.19 Other Duties | 9 |
| | 4.3 NON DISCRIMINATION | 9 |
| | 4.4 TERM OF APPOINTMENT | 9 |
| | 4.4.1 Provisional Staff Appointment | 9 |
| | 4.4.2 Active Staff | 9 |
| | 4.4.3 Other Appointments | 9 |
| | 4.4.4 Unwarranted Delay | 10 |
| | 4.4.5 Effect of Medical Staff Membership Termination | 10 |
| | 4.5 RESIGNATION FROM MEDICAL STAFF | 10 |
| | 4.6 PRACTITIONER PROVIDING CONTRACTUAL PROFESSIONAL | 10 |



# MEDICAL STAFF BYLAWS



DEFINITIONS

"Administration" The executive and administrative organization of the Medical Center.

"Allied Health Professional Affiliate Staff" means those individuals other than licensed Practitioners who are granted the privilege to exercise independent judgment within the area of their professional competence as is more specifically defined in Article V, Section 5.13, of these Bylaws.

"Board Certified" A Physician member of the Medical Staff (or applicant) who is certified as a specialist by a specialty board recognized by the American Board of Medical Specialties, or the American Osteopathic Association. An Oral Surgeon who is certified as a specialist by the Michigan Board of Dentistry and the American Board of Maxillofacial Surgery, or a podiatrist who is certified as a specialist by the American Board of Podiatric Surgery.

"Board Eligible" A Physician member of the Medical Staff (or applicant) who has met the educational, postgraduate training and skill requirements to be admissible or eligible to sit for the specialty board certification examination of a specialty board approved by the American Board of Medical Specialties, the American Osteopathic Association or the American Podiatric Medical Association, and remains eligible to sit for said examination.

"Chief Executive Officer" means the individual at the Medical Center who is appointed by the Governing Body to act on its behalf in the overall management of the Medical Center.

"Clinical Privileges" means the rights granted to a Practitioner or Allied Health Professional Affiliate Staff member to provide diagnostic, therapeutic, medical, surgical or other services at the Medical Center as specifically delineated by the Governing Body.

"Dentist" a duly licensed dentist who has completed his/her training.

"Executive Committee" means the Executive Committee of the Medical Staff unless specific reference is made to the Executive Committee of the Governing Body.

"Governing Body" means the Board of Directors of Saint Mary's Medical Center of Saginaw, Inc.

"Medical Center" means the Hospital and other facilities and programs operated by St. Mary's Medical Center of Saginaw, Inc.

"Medical Staff" means all physicians holding an active license and a controlled substance license and duly licensed dentists and podiatrists, who are privileged to attend patients in the Medical Center. These individuals may also be referred to as

7/15/2002                    2

BYLAWS OF THE MEDICAL STAFF

OF

ST. MARY'S MEDICAL CENTER OF SAGINAW, INC.

PREAMBLE

Whereas, the Medical Staff is responsible to the Governing Body of the Medical Center for the quality of all medical care provided patients in the Medical Center and for the ethical and professional practices of its members and

Whereas, the Medical Staff supports the cooperative efforts of the Medical Staff, the Chief Executive Officer and the Governing Body necessary to fulfill the Medical Center's obligations to its patients, and

Whereas, in furtherance of the Core Values of Service to the Poor, Reverence, Integrity, Wisdom, Creativity and Dedication, the Medical Center is committed to carrying out its health ministry in a manner consistent with the Mission, Vision and Values of Ascension Health and the Medical Center, as well as the Hospital's Strategic Plan, including adherence to a high standard of individual and organizational ethical and business practices,

Now therefore, the members of the medical staff practicing in this Medical Center hereby organize themselves into a Medical Staff in conformity with these Bylaws, Rules and Regulations, and the Articles of Incorporation, Bylaws, Policies, Rules and Regulations of the Medical Center.

7/15/2002

| ARTICLE | TITLES | PAGE # |
|---|---|---|
| | Committee | |
| | 11.3.5 Radiation Safety Committee | 53 |
| | 11.3.6 Tissue and Blood Committee | 54 |
| | 11.3.7 Cancer Committee | 54 |
| | 11.3.8 Physician Health and Well-Being Committee | 55 |
| ARTICLE XII | | |
| | MEDICAL STAFF MEETING | 56 |
| | 12.1 ANNUAL MEETINGS | 56 |
| | 12.2 REGULAR MEETINGS | 56 |
| | 12.3 SPECIAL MEETINGS | 56 |
| | 12.4 MINUTES | 56 |
| | 12.5 QUORUM | 56 |
| | 12.6 AGENDA | 57 |
| ARTICLE XIII | | |
| | COMMITTEE AND DEPARTMENT MEETINGS | |
| | 13.1.1 REGULAR MEETINGS | 58 |
| | 13.2 SPECIAL MEETINGS | 58 |
| | 13.3 NOTICE OF MEETINGS | 58 |
| | 13.4 QUORUM | 58 |
| | 13.5 MANNER OF ACTION | 58 |
| | 13.6 RIGHTS OF EX-OFFICIO MEMBERS | 59 |
| | 13.7 MINUTES | 59 |
| | 13.8 ATTENDANCE REQUIREMENTS | 59 |
| ARTICLE XIV | | |
| ARTICLE XV | IMMUNITY FROM LIABILITY | 60 |
| | 15.1 POLICIES, RULES AND REGULATIONS | 62 |
| ARTICLE XVI | | |
| | AMENDMENTS | 63 |
| | 16.1 MEDICAL STAFF RESPONSIBILITY AND AUTHORITY | 63 |
| | 16.2 AMENDMENT PROCEDURE | 63 |
| ARTICLE XVII | | |
| | ADOPTION | 65 |

| ARTICLE | TITLES | PAGE # |
|---|---|---|
| | 8.8 FINAL DECISION BY GOVERNING BODY | 38 |
| | 8.9 REPORTING REQUIREMENTS | 38 |
| ARTICLE IX | | |
| | OFFICERS | 39 |
| | 9.1 OFFICERS OF THE MEDICAL STAFF | 39 |
| | 9.2 QUALIFICATION OF OFFICERS | 39 |
| | 9.3 TERMS OF OFFICE | 39 |
| | 9.4 ELECTION | 39 |
| | 9.5 VACANCIES | 39 |
| | 9.6 DUTIES OF OFFICERS | 40 |
| | 9.6.1 President | 40 |
| | 9.6.2 Vice President | 40 |
| | 9.6.3 Secretary | 40 |
| | 9.6.4 Treasurer | 41 |
| | 9.7 ABSENCE OF MEDICAL STAFF OFFICERS | 41 |
| ARTICLE X | 9.8 RECALL OF OFFICERS | 41 |
| | DEPARTMENTS | 42 |
| | 10.1 DEFINITION | 42 |
| | 10.2 CLINICAL DEPARTMENTS | 42 |
| | 10.3 FUTURE DEPARTMENTS | 43 |
| | 10.4 ASSIGNMENT TO DEPARTMENTS | 43 |
| | 10.5 ORGANIZATION OF DEPARTMENTS | 43 |
| | 10.6 FUNCTIONS OF DEPARTMENT CHAIRMEN | 44 |
| ARTICLE XI | 10.7 FUNCTIONS OF DEPARTMENT | 45 |
| | COMMITTEES | 46 |
| | 11.1 ORGANIZATION OF COMMITTEES | 46 |
| | 11.2 STANDING COMMITTEES OF THE MEDICAL STAFF | 46 |
| | 11.2.1 Medical Staff Executive Committee | 46 |
| | 11.2.2 Credentials Committee | 48 |
| | 11.2.3 Medical Staff Performance Assessment and Improvement | 49 |
| | 11.2.4 Nominating Committee | 49 |
| | 11.2.5 Bylaws and Policies Committee | 50 |
| | 11.3 MULTIDISCIPLINARY COMMITTEES INVOLVING MEDICAL STAFF | 50 |
| | 11.3.1 Medical Records Committee | 50 |
| | 11.3.2 Utilization Review Committee | 51 |
| | 11.3.3 Infection Control Committee | 52 |
| | 11.3.4 Pharmacy, Therapeutics and Nutrition | 52 |

## ARTICLE IV

### MEDICAL STAFF MEMBERSHIP

4.1   NATURE OF MEMBERSHIP
Membership on the Medical Staff of Medical Center is a privilege and not a right. It is extended only to those competent practitioners who meet the standards and requirements set forth in these Bylaws and in the Medical Staff Rules and Regulations and Policies.

Appointment to the Medical Staff shall confer only such clinical privileges and prerogatives as have been granted in accordance with these Bylaws and the Medical Staff Rules and Regulations. Included among those practitioners are those in a medical administrative position by virtue of a contract with the Medical Center and those who have been granted temporary privileges.   Only practitioners who are members of the Medical Staff shall admit or provide medical or health related services to patients in the Medical Center.

No practitioner shall be entitled to membership on the Medical Staff or to the exercise of particular clinical privileges in the Medical Center merely through licensure to practice medicine, osteopathy, podiatry or dentistry in the State of Michigan or in any other state. Membership in any professional organization, or past or present privileges at another healthcare facility, does not confer such entitlement.

4.2   QUALIFICATION FOR/AND RESPONSIBILITIES OF MEMBERSHIP
Every practitioner who seeks or enjoys Medical Staff membership or temporary privileges must at the time of appointment and continuously thereafter demonstrate the following qualifications and satisfy the following responsibilities:

4.2.1  Licensure
Hold a current and valid license issued by the State of Michigan to practice medicine, osteopathy, dentistry or podiatry.

4.2.2  Performance
Document professional education, training, experience and ability to provide quality patient care services.

4.2.3  Attitude and Professional Demeanor
Demonstrate a willingness and capability, based on current attitude and evidence of performance;

## ARTICLE III

### ETHICS AND ETHICAL RELATIONSHIP

3.1   All members of the Medical Staff and Allied Health Professional Affiliate Staff pledge that they will conduct their practice in accordance with the highest ethical traditions of the medical profession. The professional conduct of the members of the Medical Staff and the Allied Health Professional Affiliate Staff shall be governed by the Catholic Diocesan Authority, the American Medical Association, the Ethical and Religious Directives for Catholic HealthCare Facilities as well as ethical standards established by their respective specialty societies as applicable.

3.2   All members of the Medical Staff and Allied Health Professional Affiliate Staff pledge to not tolerate illegal activity or other questionable conduct not meeting Saint Mary's high standard of individual and organizational, ethical and legal business practices, including the affirmative duty to report any such activity or conduct to Saint Mary's Corporate Responsibility Officer (CRO) or otherwise report any such concerns using the Corporate Responsibility Plan Reporting Protocol.

To disclose immediately by telephone and in writing to Saint Mary's Corporate Responsibility Officer any notice to the member, or his or her representative, of proposed or actual exclusions of the member from any Federal Health Care Program funded in whole or in part by the Federal Government, including Medicare or Medicaid.

## ARTICLE I

### 1.1   NAME

The name of this organization shall be the Medical Staff of St. Mary's Medical Center of Saginaw, Inc.

### ARTICLE II

2.1   THE PURPOSES OF THIS ORGANIZATION SHALL BE:

2.1.1  To promote quality medical care for all patients, admitted to or treated in any of the departments or services of the Medical Center;

2.1.2  To provide a forum for discussion of issues of a medical administrative nature by the Medical Staff with the Governing Body and the Administration;

2.1.3  To initiate and maintain rules and regulations for self-government of the Medical Staff as a means of accountability to the Governing Body;

2.1.4  To Provide a mechanism for accountability to the Governing Body utilizing defined Medical Staff parameters for the quality and appropriateness of the patient care services, professional and ethical conduct, and teaching and research activities of members of the Medical Staff;

2.1.5  To perform Peer Review through its Peer Review Committees, or a duly appointed Peer Review Committee of the Medical Center or its Governing Body.

2.1.6  To assure the appropriate credentialing of medical staff members through the delineation of staff privileges;

2.1.7  To support education and maintenance of high educational standards through participation in the scientific training of professional personnel.

2.1.8  To effect the purposes enumerated for the medical staff, it is the obligation and responsibility of the Medical Staff to commit to the Ascension Health Corporate Responsibility Program and Saint Mary's Corporate Responsibility Plan and to assure that Medical Staff Members and Allied Health Professionals, as defined in these Bylaws, are aware of and adhere to, Saint Mary's and Ascension Health Standards of Conduct, which reflect a high standard of individual and organizational, ethical and legal business practice.

"Practitioners", but shall not include Allied Health Professional Affiliate Staff as defined herein.

"Non-certified Practitioner" A practitioner who was either board eligible but has not become board certified within the period of eligibility or who was board certified and failed to meet requirements for board recertification.

"Peer Review" means, without limitation, an effective review of the professional practices in the Medical Center for the purpose of reducing morbidity and mortality and improving the care provided to patients within the Medical Center. Peer Review shall include evaluation of the quality, appropriateness and necessity of the care and treatment provided and the preventability of complications and deaths occurring in the Medical Center. It shall also include a review and determination of the qualifications, competence or performance of Practitioners and other health care providers who practice or seek privileges to practice in the Medical Center.

"Peer Review Committee" means a Committee, Department or Departmental Section of the Medical Staff or a duly appointed Peer Review Committee of the Medical Center that conducts peer review functions and activities as defined in these Bylaws and in accordance with applicable provisions of Federal and State Law. It includes those serving as members of a Peer Review Committee and those non-members assisting a Peer Review Committee or providing information to a Peer Review Committee.

"Physician" A duly licensed allopathic or osteopathic physician who has completed his /her training.

"Podiatrist" a duly licensed podiatrist who has completed his/her training.

"Practitioner" A Physician, Dentist or Podiatrist

"President of the Medical Staff" means the individual elected to that position in accordance with the Medical Staff Bylaws.

"Rules" Rules of the Medical Staff

#### 4.4.5 Effect of Medical Staff Membership Termination
Privileges to practice at the Medical Center are always contingent upon continued Medical Staff membership and also limited by the clinical privileges granted to a practitioner. The practitioner's right to use the Medical Center's facilities is automatically terminated when Medical Staff membership expires or is terminated. When a change in clinical privileges is acted upon by the governing body, such change shall have immediate effect.

### 4.5   RESIGNATION FROM MEDICAL STAFF
When a Medical Staff member intends to resign from the Medical Staff, notification shall be made in writing to the member's Department Chair. The Department Chair shall forward a recommendation to the Executive Committee and the Governing Body for action.

### 4.6   PRACTITIONER PROVIDING CONTRACTUAL PROFESSIONAL SERVICES

#### 4.6.1 Exclusive Policy
Certain Medical Center facilities may be used on an exclusive basis in accordance with contracts between the Medical Center and qualified practitioners. Applications for initial appointment or for clinical privileges related to those Medical Center facilities and services will not be accepted for processing unless submitted in accordance with an existing or proposed contract with the Medical Center.

#### 4.6.2 Qualifications
Practitioners who are or who will be providing specified professional services pursuant to a contract with the Medical Center must be processed for appointment, reappointment and awarded clinical privileges in the same manner and must fulfill all of the obligations of their appointed membership category and shall meet applicant or Medical Staff member.

#### 4.6.3 Effect of Contract Expiration or Termination

A.   The effect of expiration or other termination of a contract upon a practitioner's Medical Staff membership status and clinical privileges will be governed solely by the terms of the practitioner's contract with the Medical Center.

B.   If the contract is silent on the matter or if there is no written contract, the contract expiration or other termination alone will not affect the practitioner's Medical Staff membership status or clinical privileges. However, the practitioner may not hereafter exercise any clinical privileges for which the Medical Center has made exclusive contractual arrangements with another practitioner or practitioner group unless in conjunction with or on behalf of such practitioner or group. An adverse change in membership status or clinical privileges as defined in the

## Top Right (page 9)

#### 4.2.18 Each member of the Medical Staff, regardless of his or her assigned staff category or service line affiliation and each member exercising temporary privileges under these Bylaws have the following obligations:

To abide by and act in a manner consistent with Saint Mary's Corporate Responsibility Plan, including participation in related education and training programs.

#### 4.2.19 Other Duties
Shall discharge other Medical Staff obligations as may be established from time to time by the Medical Staff or the Medical Executive Committee.

### 4.3   NON DISCRIMINATION
No practitioner shall be denied Medical Staff membership or clinical privileges on the basis of age, color, disability, national origin, race, religion, sex or other unlawful basis.

### 4.4   TERM OF APPOINTMENT

#### 4.4.1 Provisional Staff Appointment
Provisional Staff appointments are made for a period of one year. Two one-year extensions of Provisional Medical Staff membership may be granted with the approval of the individual's Clinical Department and the Executive Committee.

#### 4.4.2 Active Staff
Appointments to the Active Medical Staff membership shall be for a period of two years. A reappointment process as described in these Bylaws, Article VI, 6.5 shall be accomplished at two-year intervals.

#### 4.4.3 Other Appointments
All other appointments to the Medical Staff will be for a period of two years. However, the Medical Executive Committee with the approval of the Joint Conference Committee may set a more frequent reappraisal period for the exercise of particular privileges or for privileges exercised by particular Medical Staff members for the purpose of monitoring quality of care issues or for those members who have identified health disabilities which affects the exercise of their clinical privileges.

#### 4.4.4 Unwarranted Delay
When, in the opinion of the Governing Body or Executive Committee, there has been an unwarranted delay on an application, reappointment or revocation of an appointment, the Governing Body, or Executive Committee shall refer the matter to the Joint Conference Committee for recommendation.

## Bottom Left (page 8)

#### 4.2.9 Board Certification
Effective with the passage of these bylaws, all new applicants for medical staff membership shall provide proof of Board Certification or Board Eligibility. Members of the Medical Staff whose initial appointment is on or after the passage of these Bylaws shall be required to achieve or maintain board certification or board eligibility for purposes of reappointment.

#### 4.2.10 Abide By Bylaws
Abide by the Bylaws, Rules and Regulations of the Medical Staff, and the Policies and Bylaws of the Medical Center as applicable.

#### 4.2.11 Complete Medical Records
Shall prepare and complete in a timely fashion the medical and other required records for all patients admitted to or in any way provided care in the Medical Center as required in the Medical Staff Rules and Regulations.

#### 4.2.12 Continuing Medical Education
Shall satisfy any continuing education requirements established by the Medical Staff in the Medical Staff Rules and Regulations.

#### 4.2.13 Arrange Coverage
Shall make appropriate arrangements for coverage of their patients as required in the Medical Staff Rules and Regulations.

#### 4.2.14 Medical Center Ability to Accommodate and Community Needs
Assessment shall conform to any determination of the Governing Body with regards to its assessment of community needs for healthcare services and the ability of the Medical Center to accommodate such needs.

#### 4.2.15 Equipment and Space
Shall provide reasonable estimates of needs for personnel, special equipment and space when requested to do so.

#### 4.2.16 Emergency Coverage
Shall participate in emergency service coverage (Call Schedule) or emergency patient care as may be established by the appropriate Medical Staff Department, specified in the Medical Staff Rules and Regulations or prescribed by applicable statutes.

#### 4.2.17 Utilization
Shall perform a sufficient number of procedures, manage a sufficient number of cases and have sufficient patient care contact with patients at the Medical Center or other facilities to permit the Medical Staff to assess the practitioner's current competency for all privileges, whether being newly requested or already granted.

## Bottom Right (page 7)

A.   To work with and relate to other Medical Staff members, residents, students, Medical Center administration, nurses, members of other health disciplines, management and employees, visitors and the community in general in the cooperative and professional manner that is essential for maintaining a Medical Center environment appropriate to quality patient care. The obligations created by this subparagraph (a) shall include a duty not to engage in conduct that is disruptive to the efficient operation of the Medical Center and/or disruptive behavior that does or could adversely affect patient care.

B.   To participate equitably in the discharge of Medical Staff obligations appropriate to each practitioner's Medical Staff category.

#### 4.2.4 Ethics
Adhere to recognized standards of professional ethics consistent with Article III herein.

#### 4.2.5 Demonstrate a willingness and capability, based on current attitudes and evidence of performance, to act in a manner consistent with Saint Mary's Corporate Responsibility Plan and its Standard of Conduct.

Each member of the Medical Staff must not be excluded currently or otherwise ineligible from participation in Federal Health Care Programs, funded in whole or in part by the Federal Government, including Medicare and Medicaid.

#### 4.2.6 Health Status
Demonstrate, or control of, any significant physical, mental or behavioral impairment that interferes with, or presents a substantial probability of interfering with, ongoing compliance with qualifications for membership required by Section 4.2. such that patient care is or is likely to be adversely affected, and to provide proof of health status, if requested.

#### 4.2.7 Geographic Proximity
Demonstrate that they are located closely enough (office and residence) to the Medical Center to provide continuous care to their patients and respond promptly to emergencies and emergency calls.

#### 4.2.8 Professional Liability Insurance
Maintains professional liability insurance with liability limits that are not less than the minimal amount as established by the Medical Staff Rules and Regulations professional liability coverage at the time of initial application to Medical Staff membership and at the time of each application for reappointment. Practitioner shall give prompt written notice of any cancellation or material change in said policy of insurance.

1) participating in the Medical Staff's teaching and continuing education programs
2) attending service or charity patients as required
3) giving consultation to other staff members consistent with their delineated privileges
4) supervising practitioners during the Provisional Staff appointment
5) fulfilling such other staff functions as may reasonably be required of staff members;

D. Attend regular and special meetings of the Medical Staff and of the Department, Section and Committees of which they are members; and

E. Pay all staff dues and assessments promptly; and

F. Support the patient care mission of Saint Mary's by providing treatment for patients presenting to the facility seeking emergency medical care regardless of the patient's ability to pay for such services.

G. Meet the obligations to participate in the on-call system if requested by the department chair, and respond promptly (in accordance with applicable medical staff policies) when called to render services.

5.3    ASSOCIATE MEDICAL STAFF

5.3.1  Qualifications for Associate Medical Staff
Associate Medical Staff members shall:

A. Be regularly involved in providing care for patients at the Medical Center or be on the active staff of another local hospital, and

B. Have completed, at least one (1) year of satisfactory performance on Provisional Status, unless specifically exempted.

5.3.2  Prerogatives of Associate Status
Associate Staff members may:

A. Admit patients within the limits outlined in the Medical Staff Rules and Regulations;

B. Exercise such clinical privileges as are granted to them.

5.3.3  Obligations of Associate Status
Associate Staff members must, in addition to meeting the basic obligations set forth in Article 4:

A. Contribute to the organizational and administrative effectiveness of the Medical Staff.

B. Discharge the recognized functions of staff membership by participating in the Medical Staff's teaching and continuing education programs, attending service or charity patients as required, giving consultation to other staff members consistent with their delineated privileges, and fulfilling such other staff functions as may reasonably be required of staff members;

C. Demonstrate active participation on the Active Staff of another hospital, including quality review activities, of a substance and character similar to Saint Mary's.

---

ARTICLE V

CATEGORIES OF THE MEDICAL STAFF

5.1    CATEGORIES OF THE MEDICAL STAFF
A. Active
B. Associate
C. Affiliate
D. Emeritus
E. Conditional Limited
F. Allied Health

Those applicants who are granted conditional limited privileges are considered to be members of the Medical Staff for the purposes of these Bylaws, as well as their rights, and obligations to the hospital and the Medical Staff.

5.2    ACTIVE MEDICAL STAFF

5.2.1  Qualifications for Active Staff
Full members of the Active Staff shall:

A. Be located close enough (office and residence) to the Medical Center so as to provide continuous care to their patients,

B. Regularly admit patients to, or otherwise be regularly involved in providing care for patients, at the Medical Center.

C. Have completed, at least one (1) year of satisfactory performance on the Provisional status.

5.2.2  Prerogatives of Active Status
An Active Staff member may:

A. Admit patients without limitation, except as otherwise provided in the Medical Staff Rules and Regulations;

B. Vote on all matters presented at general and special meetings of the Medical Staff and of the Department or Section, and Committees of which they are a member.

C. Hold office at any level in the medical staff organization and be a member of or be Chair of any Committee; and

D. Exercise such clinical privileges as are granted to them.

5.2.3  Obligations of Active Status
Active Staff members must, in addition to meeting the basic obligations set forth in Article IV:

A. Contribute to the organizational and administrative effectiveness of the Medical Staff, including service on Committees of the Medical Staff, faithfully performing the duties of any office or position to which elected or appointed;

B. Participate in the quality review activities of the Medical Center;

C. Discharge the recognized functions of staff membership by:

---

C. Unless the contract provides otherwise, any adverse action relative to the exercise of clinical privileges in any respects specified in the Medical Staff Bylaws entitles the practitioner to the procedural rights contained in the Hearing and Appellate Review Procedure. (Article IX).

4.8    TEMPORARY LEAVES FROM THE MEDICAL STAFF

4.8.1 A Practitioner may request and a leave of absence may be granted by the governing body for any reason appropriate to the mission, values and philosophy of St. Mary's. Such leaves shall be granted only in accordance with policy and procedure approved by the Medical Staff and governing body.

---

Medical Staff Bylaws that is not triggered by a contractual termination or expiration entitles the practitioner to the procedural rights contained in the Medical Center's Hearing and Appellate Review Procedure.

4.7    MEDICAL ADMINISTRATIVE OFFICERS

4.7.1  Definition
A Medical Administrative officer is a practitioner engaged by the Medical Center in an administrative capacity, whose activities may include clinical responsibilities such as direct patient care or supervision of the patient care activities of other practitioners under the officer's direction.

4.7.2  Medical Staff Membership, Clinical Privileges And Membership Obligation
It is not mandatory that a Medical Administrative Officer meets the minimum clinical requirements for reappointment and clinical privileges for the Officer to obtain and maintain Medical Staff membership. However, Medical Administrative Officers must discharge medical staff obligations appropriate to their appointed Medical Staff categories in the same manner applicable to all other Medical Staff members if they choose to engage in Clinical Practice.

4.7.3  Effect of Removal from Officer Status or Adverse Change in Membership Status or Clinical Privileges

A. The terms of the contract between the Medical Administrative Officer and the Medical Center solely governs the effect of the removal from the Medical Administrative officer's employment status on the officer's Medical Staff membership status or clinical privileges. In addition, the contract shall solely govern the effect of an adverse change in an officer's Medical Staff membership status or clinical privileges on continuance in their Medical Administrative office. An adverse change in membership status or clinical privileges as defined in the Medical Staff Bylaws that is not triggered by removal from a medical administrative office entitles the officer to the procedural rights contained in the Medical Center's Hearing and Appellate Review Procedure.

B. In the absence of a contract or where the contract is silent on the matter, removal from medical administrative office alone will not have an effect on membership status or clinical privileges. However, the removed medical administrative officer may not thereafter exercise clinical privileges for which exclusive contractual arrangements have been made. Continuance in medical administrative office following loss of medical staff membership is impermissible. The effect of a limitation in clinical privileges on continuance in office will be as determined by the Governing Body after soliciting and considering the recommendation of the Medical Staff.

## 5.8   ALLIED HEALTH PROFESSIONAL AFFILIATE STAFF (A.H.P.)

### 5.8.1   Defined

An Allied Health Professional (A.H.P.) is an individual, other than a practitioner (physician, dentist, podiatrist) who holds a license, certificate or other such credential as required by state law and the Medical Center and who is otherwise qualified to render services. A.H.P. may include physician assistants, psychologists, perfusionists, nurse practitioners and/or certified registered nurse anesthetists.

A.   Dependent Allied Health Professional
A Dependent Allied Health Professional (D.A.H.P.) is an A.H.P. who must by law be supervised by a practitioner with active or provisional active Medical Center Medical Staff membership and privileges. Nurse practitioners shall be considered D.A.H.P. when practicing at Saint Mary's.

B.   Independent Allied Health Professional.
An Independent Allied Health Professional is an A.H.P. who exercises independent judgment within the scope of their license and is not required by law to be supervised by a practitioner.

C.   Anyone with an R.N. or L.P.N. license applying for Nursing Practice Privileges or recertification at St. Mary's Medical Center must apply through the Nursing Division for recommendation to the Governing Board.

### 5.8.2   Qualifications

Only an Allied Health Professional holding a license, certificate or such other credentials as may be required by the applicable state law or by the applicable licensing or certifying agency, who meets the qualifications as established by the Medical Center, shall be eligible for appointment as an Allied Health Professional. All Allied Health Professionals must also meet the applicable obligations as set forth in Article 4.2.

### 5.8.3   Only Allied Health Professionals who satisfy the following qualifications are eligible for appointment at Saint Mary's:

Must act in a manner consistent with Saint Mary's Corporate Responsibility Plan and its Standards of Conduct.
Must not be excluded currently or otherwise ineligible from participation in Federal Health Care Programs, funded in whole or in part by the Federal Government, including Medicare or Medicaid.

### 5.8.4   Standards and Criteria

The standards and criteria for qualifications, duties, responsibilities and privileges and the monitoring of an Allied Health Professional's conduct shall be those established by the policies of the appropriate Department and approved by the Executive Committee and the Governing Body.

---

consultations, and/or direct observation. Appropriate records of the observation and evaluation shall include:
A.   Medical records delinquency less than 10% of admissions.
B.   Demonstration of collegial relationships with Medical Staff and other Medical Center personnel.
C.   Completion of orientation to Values/Mission of Saint Mary's and Ascension Health.
D.   Exhibit behavior in conformance with Values/Mission/Policies of Saint Mary's and Ascension Health.

## 5.6   EMERITUS MEDICAL STAFF

### 5.6.1   The Honorary Emeritus Staff shall consist of former Active Medical Staff members, who have discontinued their medical practice that the Medical Center and Medical Staff wish to recognize for service to the Medical Center and community. The Emeritus Staff shall be appointed by the Governing Body on recommendation of the Executive Committee and approval by the Credentials Committee. The members of the Emeritus Staff shall be eligible to attend the meetings and functions of the Active Staff and may be appointed to Medical Staff Committees. Emeritus Staff members may not vote, hold office, admit and/or treat patients.

## 5.7   CONDITIONAL LIMITED

Practitioners appointed to the conditional limited category enjoy a medical staff relationship that is restricted by duration, limited privileges, and/or by membership appointment to certain designated institutions affiliated with Saint Mary's. Each conditional limited practitioner is governed by specific limitations established by the Medical Staff Department in which the practitioner is assigned. The purpose of this category is to accommodate practitioners providing unique or specific services to Saint Mary's on an ongoing basis for which other membership categories are inappropriate.

### 5.7.1   Qualifications

Physicians appointed to the Conditional Limited membership category shall fulfill the same requirements expected of those physicians with Provisional Status.

### 5.7.2   Prerogatives

The physician in this category shall exercise only those privileges recommended by the Department and granted by the Governing Body. They shall not be eligible to vote, hold office, attend departmental or Medical Staff meetings. They shall not be required to pay dues. Reappointment shall be on a biennial basis. Physicians in this category are not considered members of the Medical Staff and shall not under any circumstances have a right to a Hearing and Appellate Review Procedure or appeal.

---

shall have completed an American Board of Medical Specialties or American Osteopathic Association approved residency in their specialty and must demonstrate completion of board certification prior to advancement.

### 5.5.1   The applicants must meet the qualifications specified in 4.2 through 4.2.18. Individuals must be qualified for advancement to the category requested at the completion of their Provisional period. Reappointment to the Provisional level of a medical staff category may not exceed three (3) full years, at which time the failure to advance from Provisional status shall be determined a termination of their medical staff appointment. Provisional Medical Staff members whose membership is so terminated shall have the rights accorded by the Bylaws to a member of the Medical Staff who has failed to be reappointed.

### 5.5.2   Prerogatives of Provisional Status.

A.   Provide care to patients in the same manner as individuals currently in the requested medical staff category.
B.   Exercise those prerogatives available to members in the requested medical staff category.
C.   May not hold office in the Medical Staff organization, chair any Committee or serve on the Medical Executive Committee or vote at Department or Active Staff meetings.
D.   Support the patient care mission of Saint Mary's by providing treatment for patients presenting to the facility seeking emergency medical care regardless of the patient's ability to pay for such services.
E.   Meet the obligations to participate in the on-call system if requested by the Department Chair and respond promptly (in accordance with applicable medical staff policies) when called to render services.

### 5.5.3   Obligations of Provisional Status.

Each member must discharge the same responsibilities as those specified for members who have advanced through provisional status in their requested medical staff category. Failure to fulfill these obligations during the provisional period is reason for denial of advancement.

### 5.5.4   Observation and Evaluation.

Practitioners with Provisional status will be observed and evaluated by the Chair of the Department with which they have their primary affiliation, and by the Chair of each of the other Departments, or their designees, in which they may also exercise clinical privileges. The purpose of this observation and evaluation shall be to assess the Practitioner's proficiency in the exercise of clinical privileges and to enable the Chair to make an informed recommendation regarding advancement from Provisional status. The observation of the Practitioner with Provisional status shall follow whatever policy each Department deems to be appropriate in order to adequately evaluate the practitioner. The review may include, but is not limited to: concurrent or retrospective chart review, mandatory

---

D.   Provide Consultation as requested to other members of the Medical Staff consistent with their Clinical Privileges.
E.   Pay all Staff dues and assessments promptly.
F.   Support the patient care mission of Saint Mary's by providing treatment for patients presenting to the facility seeking emergency medical care regardless of the patient's ability to pay for such services.
G.   Meet the obligations to participate in the on-call system if requested by the Department Chair and respond promptly (in accordance with applicable medical staff policies) when called to render services.

## 5.4   AFFILIATE MEDICAL STAFF

### 5.4.1   Members of the Affiliate Medical Staff shall meet one of the following requirements:

A.   Hold a teaching position on the faculty of a medical school affiliated with St Mary's, or
B.   Hold an employed physician administrative position in Saint Mary's administrative structure, or
C.   Limit practice to the office setting in the greater Saginaw area.

### 5.4.2   Affiliate Medical Staff members:

A.   May review patient charts
B.   May examine patients
C.   May participate in the teaching and continuing educational programs of the medical staff
D.   May serve on committees according to their abilities and talents as assigned by of the President of the Medical Staff
E.   Shall not vote, hold office, or chair committees

### 5.4.3   Obligations of the Affiliate Medical Staff

A.   Contribute to the organizational effectiveness of the Medical Staff including service on committees as assigned
B.   Discharge recognized functions of medical staff membership by:
1)   participation in the medical staff teaching and continuing education program consistent with their faculty position and academic rank
2)   fulfilling such other staff functions as may reasonably be required of medical staff membership
3)   attending meetings of their assigned Department and Committees.
4)   promptly paying all dues and assessments

## 5.5   PROVISIONAL STATUS

Upon application to the medical staff, candidates shall declare whether they are applying for Active or Associate or Affiliate status. Upon appointment by the governing body, the prefix "provisional" shall be appended to their staff category for a period of at least one year unless specifically exempted. Such candidates

## ARTICLE VI

### CREDENTIALING AND PRIVILEGING PROCESSES

6.1 The processes for credentialing and privileging of the members of the Medical Staff and the allied health professions affiliate members shall be governed by the Policies and Procedures of the Medical Staff. Policies established for this purpose are approved by the Executive Committee and the Governing Body of the Medical Center. These policies and procedures are included in the *Manual of Policies and Procedures of Saint Mary's Medical Staff* and, taken as a whole, are considered to be the "Credentialing and Privileging Manual". These policies and procedures may be changed from time-to-time, as indicated, by action of the Executive Committee and the Board of Directors.

6.2 The Credentialing and Privileging Manual provides direction for the following processes: Initial Appointment to the Medical Staff, Delineation of Clinical Privileges at the Medical Center and Reappointment to the Medical Staff.

6.3 The Credentialing and Privileging Manual assures that the following functions and processes of credentialing and privileging are completed on a timely basis for each applicant to, and member of, the Medical Staff:

6.3.1 Collection and Summarization of Pertinent Information

6.3.2 Review of Information

6.3.3 Informed Recommendation to the Board of Directors for Action

6.4 Initial applicants to the Medical Staff shall be divided into two categories and processed separately according to the policies and procedures established for each category, as follows:

6.4.1 Uncomplicated Applicants (Fast Track Process)

6.4.2 All Other Applicants (Standard Process)

6.5 The Credentials Committee shall have the responsibility to create, update, continuously improve and recommend for approval by the Executive Committee and Board of Directors the policies and procedures regarding credentialing and privileging. The Credentials Committee will perform this responsibility so as to assure that these policies and procedures are maintained appropriately with reference to appropriate laws and the requirements of appropriate credentialing authorities.

---

A. the roles, responsibilities and patient care activities of Residents;
B. the mechanisms by which the Residents' supervisors and the graduate education program director make decisions about each Resident's progressive involvement and independence in specific care activities;
C. the delineation of which Residents and classes of Residents may write patient care orders; under what circumstances they may do so; and what entries must be countersigned by a supervising physician.

5.9.2 The Graduate Education Committee must work with the Medical Staff Executive Committee to assure that each Resident is supervised in his/her patient care responsibilities, by a Practitioner who possesses clinical privileges commensurate with the supervising activities.

5.9.3 The Graduate Education Committee must communicate periodically with the Executive Committee and the Governing Body about the performance of the Residents, patient safety issues, and quality of patient care.

---

hearing shall be represented by or accompanied by legal counsel. The D.A.H.P. and the physician-employer where applicable shall be given at least three days written notice of the time and place of the hearing. The ad hoc committee may modify, terminate or affirm the terms of the corrective action taken by the Department Chair, or the chair's designee.

C. Appeal of Hearing Recommendation
The physician-employer or the D.A.H.P. may appeal the decision of the ad hoc committee to the Executive Committee of the Medical Staff only with respect to the procedural fairness of the hearing. Any such appeal must be in writing and submitted to the Chair of the Medical Executive Committee within five business days after the decision of the ad hoc committee.

D. Immunity for Participants:
When applying for medical staff privileges, the physician-employer and the D.A.H.P. shall be deemed to have agreed to the provisions for discipline, suspension and corrective action and also shall have agreed that it is in the best interest of quality patient care that such disciplinary measures be taken without personal liability to the members of the Medical Staff, members of each Department or the officers or employees of the Medical Center. Therefore, all such persons shall be immune for civil liability arising from any acts, reports, communications, or recommendations made hereunder.

5.8.10 Professional Liability Insurance
At the time of appointment and reappointment, each A.H.P. and the physician-employer of a D.A.H.P. at the time of appointment and reappointment shall furnish proof of adequate professional liability insurance as determined by the Medical Center. The physician-employer of the D.A.H.P. also shall be deemed to have agreed to be responsible for all the acts of the D.A.H.P. while the A.H.P. attends to its patients in the Medical Center.

5.8.11 Discipline for Independent Allied Health Providers
An Independent Allied Health Professional shall be afforded the same rights to hearings and appeals on disciplinary matters, applications and reapplications for as are the Medical Staff members.

### 5.9 HOUSE OFFICERS

5.9.1 House Officers, sometimes referred to as Residents, are persons who have graduated from an accredited medical (allopathic or Osteopathic) or dental school, and are in training as a Practitioner. Residents are permitted to function clinically only in accordance with the written training protocols developed by the Graduate Education Committee. The protocols must delineate the following items:

---

5.8.5 Allied Health Professionals must commit to the Ascension Health Corporate Responsibility Program and Saint Mary's and Ascension Health Standards of Conduct, which adhere to Saint Mary's and Ascension Health Corporate Responsibility Plan and reflect a standard of individual and organizational ethical and legal business practices.

5.8.6 Procedure for Appointment
Each A.H.P. and the employer of each dependent A.H.P. shall file an application for appointment on a form provided by the Medical Center. The procedure for evaluation and appointment shall be the same procedure as provided for members of the Medical Staff.

5.8.7 Term and Appointment
The term of privileges granted to, and the reappointment of, each A.H.P. shall be reviewed at least once every two years pursuant to a schedule determined by the Medical Staff. The procedure for reappointment shall follow the procedures set forth for reappointment for members of the Medical Staff.

5.8.8 Status of Allied Health Professionals
Allied Health Professionals shall not be members of the Medical Staff, shall not be able to admit patients to the Medical Center, shall not be entitled to the rights, privileges and responsibilities of staff membership (except as provided in Section 5.13.9), and shall only practice within the scope of service specifically approved for them by the Governing Body. Appointment as an A.H.P. is at the discretion of the Governing Body, may be terminated at the will of the Governing Body and, except as otherwise stated in this article, shall not be subject to the Hearing and Appellate Review Procedure prescribed for the Medical Staff.

5.8.9 Discipline for Dependent Allied Health Professionals (D.A.H.P.)
Whenever the activity and conduct of a D.A.H.P. is considered to be in violation of the standards and criteria established for A.H.P.s, the Department Chair, or chair's designee, may summarily suspend the privileges of, or otherwise take corrective action against, the D.A.H.P.

A. Notice of Hearing
The D.A.H.P. and the supervising physician, where applicable, shall be given notice of the effective time, date and reason for the suspension or other corrective action. Within five (5) business days after receipt of such notice, the D.A.H.P. or where applicable, the physician-employer may request in writing a hearing before an ad hoc committee of the Department.

B. Hearing
The ad hoc committee shall be appointed by the Chair of the Department, or in the chair's absence, the chair's designee. The ad hoc committee shall not be composed of economic competitors of the D.A.H.P. or the employing physician. The hearing shall be informal. No party to the

suspension shall become effective immediately upon imposition. The practitioner shall be notified as soon as reasonably possible, and such notice shall contain a general statement regarding the reasons for the summary suspension and advise the practitioner of his/her hearing rights under Article VIII of these Bylaws. 8.4-2.

7.4.2   In accordance with Article VIII of these Bylaws a practitioner or allied health professional whose clinical privileges have been summarily suspended shall be entitled to request that the Executive Committee of the Medical Staff hold a Hearing on the matter within such reasonable time period thereafter as the Executive Committee may be convened.

7.4.3   In accordance with Article VIII of these Bylaws, following such Hearing and submission of the Hearing Committee's recommendation, the Executive Committee may recommend modification, continuance or termination of the terms of the summary suspension. If, as a result of following such Hearing, the Executive Committee does not recommend immediate termination of the summary suspension, the affected practitioner shall, in accordance with Article VIII, be entitled to request an Appellate Review by the Governing Body, but the terms of the summary suspension as sustained or as modified by the Executive Committee shall remain in effect pending a final decision thereon by the Governing Body. The Appellate Review Procedures of Article VIII shall not apply to dependent allied health professionals. In cases applicable to dependent allied health professionals, the recommendation decision of the Executive Committee shall be forwarded to the Chief Executive Officer who shall have the authority to take final and binding action.

7.4.4   Immediately upon the imposition of a summary suspension, the President of the Medical Staff or responsible Departmental Chair shall have authority to provide for alternative medical coverage for the patients of the suspended practitioner still in the Medical Center at the time of such suspension. The wishes of the patients shall be considered in the section selection of an alternative practitioner. The President of the Medical Staff or responsible Departmental Chair also shall have authority to provide for alternative service coverage for patients of a suspended allied health professional.

7.4.5   Automatic Suspension/ Termination of Privileges

The President of the Medical Staff or the Chief Executive Officer shall enforce this Section (7.4.5-7.7) except as otherwise provided and shall have the authority to impose a suspension or restriction as permitted in this Section. (7.4.5-7.7)

---

shall apply thereto. The Executive Committee shall make a record of such appearance. Failure of the Practitioner to appear before the Executive Committee pursuant to its invitation shall constitute a waiver of the Practitioner's opportunity to so appear.

7.3.5   The action of the Executive Committee on a request for corrective action may be to reject or modify the request for corrective action, to issue a verbal warning, a letter of admonition, or a letter of reprimand, to impose terms of probation or a requirement for consultation, to recommend reduction, suspension or revocation of clinical privileges, to recommend that an already imposed summary suspension of clinical privileges, be terminated, modified or sustained, or to recommend that the staff membership be suspended or revoked. A record of any and all such actions shall be made in the minutes of the Executive Committee meeting.

7.3.6   If the Executive Committee recommends adverse action against a practitioner, the affected practitioner shall be entitled to the procedural rights provided in Article VIII of these Bylaws. The rights provided in Article VIII shall not apply to dependent allied health professionals. As to such individuals the recommendation decision of the Executive Committee shall be forwarded to the Chief Executive Officer whose decision on the matter shall be final and binding.

7.3.7   The President of the Medical Staff shall promptly notify the Chief Executive Officer in writing of all requests for corrective action received by the Executive Committee and shall continue to keep the Chief Executive Officer fully informed of all action taken in connection therewith. After the Executive Committee has made its recommendation in the matter, the procedure to be followed as to practitioners shall be as provided in Article VIII, of these Bylaws.

7.3.8   Corrective (Professional Review) action, based on the professional competence or professional conduct of an individual practitioner, which affects, or could affect, adversely, the health or welfare of a patient, and which adversely affects, or may adversely affect the clinical privileges or Medical Staff membership of a practitioner shall be reported to the appropriate State Licensure/Examining Board and National Practitioner Data Bank (in accordance with State and Federal Law) only after a final determination has been made in conformance with the provision of these Bylaws.

7.4   SUMMARY SUSPENSION

7.4.1   Any one of the following: the President of the Medical Staff, the Chair of a the Clinical Department, the Chief Executive Officer or the Executive Committee of either the Medical Staff or the Governing Body shall each have the authority, whenever action must be taken immediately in the best interest of patient care in the Medical Center, to summarily suspend all or any portion of the clinical privileges of a practitioner or allied health professional, and such summary

---

7.3   PROCEDURE

7.3.1   Whenever the activities or professional conduct of any practitioner or allied health professional with clinical privileges are considered to be lower than the standards or goals of the medical staff or to be disruptive to the operations of the Medical Center, corrective action against such individual may be requested by an officer of the Medical Staff, by the Chair of any Clinical Department, by the Chair of any standing committee of the Medical Staff, or by the Chief Executive Officer, or by the Governing Body. All requests for corrective action shall be in writing, shall be made to the Executive Committee, and shall be supported by a general statement of reference to the specific activities or conduct which constitute the grounds for the request.

7.3.2   Whenever the appropriate corrective action could entail a modification, reduction or suspension of clinical privileges or medical-staff membership, the Executive Committee shall forward such request for corrective action to the Chair of the Department wherein the practitioner or allied health professional has such privileges. Upon receipt of such request, the Chair of the Department shall immediately appoint an ad hoc department committee to investigate the matter.

7.3.3   Within fifteen twenty-one (21) days after the Department's receipt of the request for corrective action, the Department shall make a report of its investigation to the Executive Committee. Prior to the making of such report, the practitioner or allied health professional against whom corrective action has been requested shall be required to appear have an opportunity for an interview with the departmental ad hoc investigating committee. At such interview, the practitioner shall again be informed of the general nature of the issue against him and shall be invited to discuss, explain or refute them. This interview shall not constitute a Hearing, shall be preliminary in nature, and none of the procedural rules provided in these Bylaws with respect to Hearings shall apply thereto. A record of such interview shall be made by the Department and included with its report to the Executive Committee. Failure of the Practitioner to appear before the committee pursuant to its invitation shall constitute a waiver of the Practitioner's opportunity to so appear.

7.3.4   Within fifteen days At the next meeting of the Executive Committee following receipt of a report from the Department following the Department's investigation of a request for corrective action involving reduction or suspension of clinical privileges, the Executive Committee shall undertake appropriate consideration upon of the request. If the appropriate corrective action could involve a reduction or suspension of clinical privileges, or a suspension or expulsion from the staff, the affected practitioner or allied health professional shall be permitted required to make an appearance before the Executive Committee prior to its taking formal action undertaking appropriate consideration upon such request. This appearance shall not constitute a Hearing, shall be preliminary in nature and none of the procedural rules provided in these Bylaws with respect to Hearings

---

ARTICLE VII

CORRECTIVE ACTION

7.1   DISCRETIONARY INTERVIEW PRIOR TO CORRECTIVE ACTION

Nothing in these Bylaws shall prevent the Medical Staff Officers, Department Chair, Section Chiefs, members of the Medical Staff or the Administrative Staff of the Medical Center, from informally reviewing possible causes for corrective action, interviewing the involved practitioners and attempting to resolve all such matters without resorting to formal corrective action. Informal counseling is expected and encouraged but not required. It is hoped that formal requests for corrective action will not ordinarily be used until and unless informal methods have failed.

7.2   GROUNDS FOR ACTION

Whenever, on the basis of information and belief, the President of the Medical Staff, the Vice President of Medical Affairs, the Chair of a clinical department, the Chair or majority of any medical staff committee, Chair of the Governing Body or the President and Chief Executive Officer of the Medical Center has cause to question:

A.   The clinical competence of any practitioner;
B.   The care and treatment of a patient or patients or the management of a case by any practitioner;
C.   Violation by any practitioner of applicable ethical standards or the Bylaws, including the requirements for membership set forth in Article IV, policy, Rules and Regulations of the Medical Center or its Boards, Medical Staff or clinical department; or
D.   Behavior or conduct on the part of any practitioner that is considered lower than the standards of the Medical Center or disruptive to the orderly and efficient operation of the Medical Center or its Medical Staff, including the inability of the practitioner to work harmoniously with others.
E.   Violation of any State or Federal Statute or regulation, which governs or prescribes behavior for the practice of medicine or clinical practice.
F.   Any act or omission which in any way threatens the quality of patient care, the orderly functioning of Saint Mary's or its Medical Staff, the ethical and legal standards of Saint Mary's and staff, or which is in violation of these Bylaws, Saint Mary's Corporate Responsibility Plan, and its Standards of Conduct, the Ethical and Religious Directives for Catholic Health Care Services, or of the Law, is grounds for a corrective action, then said person may request corrective action. The request may be triggered by a single incident or may be based on an accumulation of incidences or complaints.

ARTICLE VIII

HEARING AND APPELLATE

REVIEW PROCEDURE

8.1   RIGHT TO HEARING AND TO APPELLATE REVIEW

8.1.1   When any practitioner receives notice of a recommendation of the Executive Committee that, if ratified by decision of the Governing Body, will affect adversely his or her appointment to, or status as, a member of the Medical Staff or his or her exercise of clinical privileges, he or she shall be entitled to a hearing before an ad hoc committee of the Medical Staff. If the recommendation of the Executive Committee following such hearing is still adverse to the affected practitioner, he or she then shall be entitled to an appellate review by the Governing Body before the Governing Body makes a final decision on the matter.

8.1.2   When any practitioner receives notice of a preliminary decision by the Governing Body that will affect his or her appointment to, or status as, a member of the Medical Staff or his or her exercise of clinical privileges and such decision is not based on a prior adverse recommendation by the Executive Committee of the Medical Staff with respect to which he or she is entitled to a hearing and appellate review, he or she shall be entitled to a hearing by the Joint Conference Committee and, if such hearing does not result in a favorable recommendation, to an appellate review by the Governing Body, before the Governing Body makes a final decision on the matter.

8.1.3   Whenever any practitioner receives notice that his or her clinical privileges have been summarily suspended in accordance with Article VII of these Bylaws, he or she shall be entitled to a Hearing before an ad hoc committee of the Medical Staff.

8.1.4   All hearings and appellate reviews shall be in accordance with the procedural safeguards set forth in this Article VIII to assure that the affected practitioner is accorded all rights to which he or she is entitled, under these Bylaws.

8.2   NOTICE OF ADVERSE RECOMMENDATION

8.2.1   In any case in which the Executive Committee makes a recommendation that, if ratified by decision of the Governing Body, will affect adversely the practitioner's appointment to, or status as, a member of the Medical Staff or his or her exercise of clinical privileges or in any case in which the Governing Body has made a preliminary decision that will effect the Practitioner's appointment to or status as a member of the Medical Staff or his or her exercise of clinical privileges, or in the event that the Practitioner receives notice that his or her clinical privileges have been summarily suspended in accordance with Article VII of these Bylaws,

7.8.2.   Statement of Grounds
Prior to removal of a Medical Administrative Officer, for grounds unrelated to his or her professional clinical activity and exercise of clinical privileges, the Governing Body through the Chief Executive Officer, shall transmit to such Medical Administrative Officer and to the President of Medical Staff a written notice of the proposed removal from office together with a statement specifying the grounds for such removal. To the extent that such grounds explicitly relate to professional clinical capability or to the exercise of clinical privileges, the notice to the officer whose removal is sought shall take the form of a special notice; and, for hearing purposes, the proposed removal shall be deemed equivalent to an adverse recommendation of the Executive Committee. If the stated grounds for dismissal are based solely on non-clinical matters, the following specified procedures shall apply.

7.8.3   Agreement on Grounds for Removal
If the ad-hoc committee's opinion is in agreement with the statement that the grounds for removal are solely non-clinical, the officer's remedies under these Bylaws shall be deemed to have been exhausted and the removal shall be effective consistent with general manner of removal.

7.9   REMOVAL OF ELECTED OFFICERS AND DEPARTMENT CHAIRMEN

7.9.1   Except as otherwise provided in these Bylaws, removal of an elected officer or Department Chair may be initiated, with or without presentation of a statement of cause thereof, by the Executive Committee or upon the presentation of a written petition signed by not less than 20 per cent of the members eligible to vote for officers.

7.9.2   Such removal may be effected by a two-thirds vote of the members eligible to vote for officers. Voting on removal of an elected Officer or Department Chair shall be by secret written mail ballot.

7.9.3   The written mail ballots shall be sent to each voting member at least seven days before the voting rates set forth herein and the ballots shall be counted by the Secretary/Treasurer of the Medical Staff. When the Secretary/Treasurer of the Medical Staff is the subject of the balloting, the President shall count the ballots in the presence of the Executive Committee.

7.5.3   Medical Records
A.   Automatic suspension of Medical Staff privileges related to a failure to complete medical records in a timely fashion will be as dictated by the Section in the Medical Staff Rules and Regulations Policies pertaining to medical record completion.
B.   Membership Status Review
After the third suspension within any twelve-month period for failure to complete or prepare one or more medical records, the practitioner's membership status shall be reviewed by the Executive Committee. Further action after a third warning or suspension may be taken under Section 7.1 or 7.2 above.

7.5.4   Professional Liability
Whenever a practitioner fails to maintain the minimal amount of professional liability insurance as required under these Bylaws, a practitioner's Medical Staff membership and clinical privileges shall be suspended immediately.

7.6   Practitioners that remain on automatic suspension without good cause for a period of 30 days shall have their membership, including admitting, consulting and related clinical privileges, terminated. Upon correction of the deficiency which led to the automatic suspension, practitioners shall have the opportunity to request a reinstatement of membership, including admitting, consulting and related clinical privileges, when such request shall be advanced in person and cannot be considered prior to the next regularly scheduled meeting of the Medical Executive Committee. Any such suspension shall be given due consideration in the Medical Staff reappointment process.

7.7.1   It shall be the duty of the President of the Medical Staff and Chief Executive Officer of the Medical Center to enforce all automatic suspensions.

7.8   REMOVAL FROM OFFICE OF MEDICAL ADMINISTRATIVE OFFICER

7.8.1 General Manner of Removal
Removal from office of a Medical Administrative Officer for grounds unrelated to their professional clinical activity and the exercise of clinical privileges may be accomplished in accordance with the usual personnel policies of the Medical Center or the terms of such officer's employment agreement, if any. The effect of such removal upon the officer's clinical privileges (if any) shall be determined in accordance with ARTICLE IV, paragraph 4.7.3 of these Bylaws. To the extent that the grounds of removal include matters relating to competence and performing professional clinical tasks, or in exercising clinical privileges, resolution of the matter shall be in accordance with Article VII and VIII.

7.5   LICENSE

7.5.1   A.   Revocation
Whenever a practitioner's license to practice in this State is revoked or restricted, their Medical Staff privileges membership and clinical privileges shall be similarly, immediately and automatically revoked or restricted.
B.   Restriction
Whenever a practitioner's license is partially limited or restricted in any way, those clinical privileges, which had been granted, that are within the scope of limitation or restriction shall automatically be similarly limited or restricted automatically.
C.   Suspension
Whenever a practitioner's license is suspended, their Medical Staff membership and clinical privileges shall be automatically suspended effective upon, and for at least the term of, the suspension.
D.   Probation
Whenever a practitioner is placed on probation by the licensing authority, their voting and office holding prerogatives shall be automatically suspended effective upon, and for at least the term of, the probation.

7.5.2   Drug Enforcement Administration (DEA)
A.   Revocation
Whenever a practitioner's DEA or other controlled substance number is revoked, the practitioner is divested immediately and automatically of their right to prescribe medications covered by the DEA number or other control substance number. Medical Staff membership and privileges shall be similarly automatically and immediately revoked.
B.   Restriction
Whenever a practitioner's use of their DEA or other controlled substance number is partially restricted or limited in any way, their right to prescribe medications covered by that number similarly shall be restricted or limited effective upon, and for at least the term of, and in a manner consistent with, any other conditions of the restriction or limitation.
C.   Suspension
Whenever a practitioner's DEA or other control substance number is suspended, they shall be divested of the right to prescribe medications covered by that number effective upon, and for at least the term of, the suspension.
D.   Probation
Whenever a practitioner is placed on probation by State or Federal authorities and their use of the DEA number or controlled substance number is affected, such shall constitute grounds for corrective action.

8.6.4   Postponement of Hearings beyond the time set forth in the Bylaws shall be made only with the approval of the Hearing committee. Granting of such postponements shall be at the sole discretion of the hearing committee.

8.6.5   The affected practitioner shall be entitled to be accompanied by, and/or represented at, the hearing by a member of the Medical Staff in good standing or by a member of his or her local professional society, an attorney or any other person of the practitioner's choice. The Executive Committee or Joint Conference Committee also may be represented by legal counsel.

8.6.6   Either a hearing officer, if one is appointed, or the Chair of the hearing committee or designee shall preside over the hearing to determine the order of procedure during the hearing, to assure that all participants in the hearing have a reasonable opportunity to present relevant oral and documentary evidence and to maintain decorum.

8.6.7   The hearing need not be conducted strictly according to the rules of law relating to the examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be considered, regardless of the existence of any common law or statutory rule which might make evidence inadmissible over objection in civil or criminal action. Both parties shall, prior to or during the hearing, be entitled to submit memoranda concerning any issue of procedure or of fact, and such memoranda shall become a part of the hearing record.

8.6.8   The Executive Committee, when its action has prompted the hearing or if the Hearing is being held in relation to a summary suspension, shall appoint one of its members or some other Medical Staff member to present the facts in support of such adverse recommendation or summary suspension and to examine witnesses. The Governing Body, when its action has prompted the hearing shall appoint one of its members or the Chief Executive Officer to present the facts in support of its preliminary adverse decision and to examine witnesses. It shall be the obligation of such representative to present appropriate evidence in support of the adverse recommendation, preliminary decision or summary suspension, but the affected practitioner shall thereafter be responsible for supporting his or her challenge thereto by an appropriate showing that the charges or grounds involved lack any factual basis or that such basis or any action based thereon is either arbitrary, unreasonable or capricious.

8.6.9   Each party shall have the following rights: to call and examine witnesses, to introduce written evidence, to cross-examine any witness on any matter relevant to the issue of the hearing, to challenge any witness and to rebut any evidence. If the practitioner does not testify in his or her own behalf, he or she may be called and examined as if under cross-examination. Oral evidence shall be taken only on oath or affirmation.

the hearing committee. The hearing officer shall not vote. No staff member who participated actively in the consideration of the adverse recommendation or summary suspension shall be appointed a member of this hearing committee, unless it is otherwise impossible to select a representative group due to the size of the Medical Staff. No staff member who is in direct economic competition with the staff member requesting the hearing shall be appointed to serve on the hearing committee.

8.5.2   When a hearing relates to a preliminary adverse decision of the Governing Body and such decision is not based on a prior adverse recommendation by the Executive Committee of the Medical Staff with respect to which he or she is entitled to a Hearing and Appellate Review, the Joint Conference Committee shall conduct such hearing and, if it so desires, appoint a hearing officer to preside over the Hearing and to be advisor to the Joint Conference Committee. The hearing officer shall not vote.

8.5.3   If the practitioner has any reason to challenge any member of the hearing committee for bias, prejudice or being in direct economic competition, such challenge shall be stated in writing to the President of the Medical Staff, or to the Chairman of the Joint Conference Committee, whichever is appropriate within seven (7) days of the practitioner's receipt of notice of the members of the committee (within twenty-four (24) hours on summary action cases). The President of the Medical Staff or the Chairman of the Joint Conference Committee, whichever is appropriate, then may substitute another member or members on the committee.

8.6   CONDUCT OF HEARING

8.6.1   There shall be at least a majority of the members of the hearing committee present when the hearing takes place, and no member may vote by proxy.

8.6.2   An accurate record of the hearing must be kept. The mechanism shall be established by the hearing committee and may be accomplished by use of a court reporter, electronic or video recording unit, detailed transcription or by the taking of adequate minutes. If a record keeping mechanism other than a court reporter is used, the affected practitioner must agree, in writing, to the method of keeping a record of the hearing before the hearing commences.

8.6.3   The personal presence of the practitioner for whom the hearing has been scheduled is required. A practitioner who fails without good cause to appear personally and proceed at such hearing shall be deemed to have waived his or her rights in the same manner as provided in Section 3 of this Article VIII and to have accepted the adverse recommendation, preliminary decision or summary suspension involved.

8.3.4   In any case in which the physical or mental health of a practitioner is at issue, a request for a hearing shall constitute a waiver in favor of the Medical Center, its agents and employees, and all members of its Governing Body, Chief Executive Officer, Executive Committees and all members of the Medical Staff of any medical or physician-patient privilege, relating to such physical or mental condition, whether such privilege is granted by the statutes or case law of the State of Michigan or any other jurisdiction, and the release of any physician, hospital or other person or entity from any and all liabilities for the release of any information, which, except for such waiver, would be privileged and confidential.

8.4   NOTICE OF HEARING

8.4.1   Within fifteen (15) days after receipt of a request for hearing from a practitioner entitled to the same, the Executive Committee or the Governing Body, whichever is appropriate, shall schedule and arrange for such a hearing and shall, through the Chief Executive Officer, notify the practitioner of the time, place and date so scheduled, by certified mail, return receipt requested. The hearing date shall be not less than thirty (30) days, nor more than forty-five (45) days from the date of receipt of the request for hearing, provided, however, that a hearing for a practitioner who is under suspension which is then in effect shall be held as soon as arrangements therefore may reasonably be made, but not later than thirty (30) days from the date of receipt of such practitioner's request for hearing.

8.4.2   The notice of hearing shall state in concise language the acts or omissions with which the practitioner is charged, a list of specific or representative medical records being questioned, and/or the other reasons or subject matter that was considered in making the adverse recommendation, preliminary decision or summary suspension.

8.4.3   The notice also shall contain the names of the members of the hearing panel together with a list of the witnesses (if any) then expected to testify against the practitioner, at the hearing. Additional witnesses may be added to the witness list provided that the practitioner receives written notice of such additional witnesses prior to the Hearing.

8.5   COMPOSITION OF HEARING COMMITTEE

8.5.1   When a hearing relates to an adverse recommendation of the Executive Committee or to a summary suspension of a practitioner's clinical privileges, such hearing shall be conducted by an ad hoc hearing committee of the Active Medical Staff five (5) nor more than seven (7) members of the Active Medical Staff by the President of the Medical Staff in consultation with Committee, and one of the members so appointed shall be designated. The Executive Committee or the hearing committee may request Body to appoint a hearing officer to preside over the Hearing and to

the Chief Executive Officer shall give written notice within seven (7) days thereof to the Practitioner involved by certified mail, return receipt requested. This notice shall contain the following:

A.   The recommendation of the Executive Committee, preliminary decision of the Governing Body or notice of summary suspension;

B.   A general statement regarding both the action and the charges and reasons for the adverse recommendation, preliminary decision or summary suspension;

C.   Advise the practitioner of his or her right to a hearing and appellate review in accordance with Article VIII of the Medical Staff Bylaws;

D.   Advise the practitioner that he or she shall have thirty (30) days after receipt of any notice provided hereunder within which to request a hearing or appellate review; which such request shall be made in writing and forwarded to the Chief Executive Officer via certified mail, return receipt requested.

E.   Advise the practitioner that failure to request a hearing or appellate review within the time allowed in Article VIII of the Bylaws shall constitute a waiver of the right to same and that the Governing Body will proceed to a final decision based on the recommendations and information available.

8.3   REQUEST FOR HEARING

8.3.1   The Chief Executive Officer shall be responsible for giving written notice of the right to a Hearing to any affected practitioner who is entitled to a hearing by certified mail, return receipt requested. Any request by the affected practitioner to exercise the right to a Hearing shall likewise be in writing and addressed to the Chief Executive Officer via certified mail, return receipt requested.

8.3.2   The failure of a practitioner to request a hearing to which he or she is entitled by the Bylaws within the time and in the manner herein provided shall be deemed a waiver of the right to such hearing and to any appellate review to which he or she otherwise might have been entitled on the matter.

8.3.3   When the waived hearing and appellate review relates to an adverse recommendation of the Executive Committee of the Medical Staff or preliminary decision of the Governing Body, the practitioner shall be deemed to have accepted the adverse recommendation or preliminary decision pending the Governing Body's final decision based on the recommendations and information available to it. When the waived Hearing and Appellate Review relates to a summary suspension of a practitioner's clinical privileges, such summary suspension shall continue to be in effect pending the Governing Body's final decision with regard thereto based on the information available to it.

the Executive Committee or the Joint Conference Committee, whichever is appropriate, for further review and recommendation. Such review may include a request that the Executive Committee of the Medical Staff or the Joint Conference Committee, whichever is appropriate, arrange for a further hearing to resolve disputed issues. Such a review and recommendation or Hearing shall be accomplished as soon as may reasonably be possible.

8.7.10 The appellate review shall not be deemed to be concluded until all of the procedural steps provided in this Section (8.7) have been completed or waived. All actions required of the Governing Body may be taken by the Executive Committee of the Governing Body duly authorized to act.

8.8   FINAL DECISION BY GOVERNING BODY

8.8.1 Within ten (10) days after the conclusion of the appellate review, if such review was conducted by the Governing Body, or within ten (10) days after receipt of the report and recommendation, if such review was conducted by an appointed review committee, the Governing Body shall make its final decision in the matter and shall, within seven (7) days of such decision, send notice thereof including a statement of the basis for the decision to the Executive Committee and, through the Chief Executive Officer, to the affected practitioner, by certified mail, return receipt requested. This decision shall be effective immediately and shall be final and shall not be subject to further hearing or appellate review.

8.8.2 Notwithstanding any other provision of the Medical Staff Bylaws, no practitioner shall be entitled as a right to more than one hearing and one appellate review on any matter which shall be subject to a Hearing and Appellate Review pursuant to the Medical Staff Bylaws.

8.8.3 All time limitations contained in the hearing and appellate review procedure may be extended by the Governing Body or applicable committee, at their respective sole discretion, except for the time limitations relative to requesting a hearing or appellate review, which in no event shall be extended.

8.8.4 All current, former or suspended members of the Medical Staff or applicants for Medical Staff appointment agree as a precondition to the granting, retaining or reinstatement of Medical Staff appointment that the decision of the Governing Body regarding appellate review shall be final and binding.

8.9   REPORTING REQUIREMENTS

The Medical Center shall report any adverse action in accordance with applicable state and/or federal laws and regulations.

appellate review be held only on the record on which the adverse determination is based, as supported by the practitioner's written statement provided for below, or may also request that oral argument be permitted as part of the appellate review. Oral argument shall only be granted in the sole discretion of the body conducting the appellate review.

8.7.2 If appellate review is not requested within such thirty (30) day period, the affected practitioner shall be deemed to have waived his or her right to the same and to have accepted such adverse determination as provided in Section 3 of Article VIII herein, and the Governing Body will proceed to a final decision based on the recommendations and information available to it.

8.7.3 Within its days after receipt of such notice of request for appellate review, the Governing Body shall schedule a date for such review, including a time and place for oral argument if such has been granted, and shall, through the President and Chief Executive Officer, by written notice sent by certified mail, return receipt requested, notify the affected practitioner of the same. The date of the appellate review shall not be less than 30 days nor more than 45 days from the date of receipt of the notice of request for appellate review, except that, when the practitioner requesting the review is under a suspension, which is then in effect, such review shall be scheduled as soon as the arrangements for it may reasonably be made, but not more than 30 days from the date of receipt of such notice.

8.7.4 At the election of the Executive Committee of the Governing Body, the appellate review shall be conducted by either the Governing Body or by a duly appointed appellate review committee. No person who is in direct economic competition with the affected practitioner, nor any person who actively participated in the prior consideration of the adverse recommendation, preliminary decision or summary suspension regarding the affected practitioner, or any Hearing held with respect thereto, shall be appointed to serve on the Appellate Review Committee.

8.7.5 The affected practitioner shall have access to the Hearing record and other written documentation, if any, of the hearing committee and all other written information or documentation that was considered by the Executive Committee or Governing Body in making the post Hearing adverse determination against him or her. He or she may if he or she so desires, submit a written statement in his or her own behalf, in which those factual and procedural matters, with which he or she disagrees, and his or her reasons for such disagreement shall be specified. This written statement may cover any matters raised at any step in the procedure to which the appeal is related and legal counsel may assist in its preparation or may prepare said statement for the affected practitioner. Such written statement shall be mailed to the Governing Body through the President and Chief Executive Officer by certified mail, return receipt requested, at least 15 days prior to the scheduled date for the appellate review. A similar statement may be submitted in like manner by the Executive Committee or by the

Governing Body, whichever is appropriate and if submitted, the Chief Executive officer shall mail a copy thereof to the practitioner at least seven (7) days prior to the date of such appellate review by certified mail, return receipt requested.

8.7.6 The Governing Body or its appointed review committee shall act as an appellate body. It shall review the Hearing record and all other written information and documentation considered in the prior proceedings and shall also consider any written statements submitted pursuant to sub-paragraph 8.7.5 of this Section for the purpose of determining whether the post Hearing adverse determination against the affected practitioner was reasonable, based on the facts, and was not arbitrary or capricious. If oral argument is granted as part of the Appellate Review procedure, the affected practitioner shall be present at such appellate review, shall be permitted to speak against the post Hearing adverse determination and shall answer questions put to him or her by any member of the appellate review body. The affected practitioner if he or she so desires, may be represented by an attorney or other person of his or her choice at such oral argument. The Executive Committee or the Governing Body, whichever is appropriate, shall also be represented at oral argument by an individual who shall be permitted to speak in favor of the post Hearing adverse determination and who shall answer questions put to them by any member of the appellate review body. The Executive Committee or the Governing Body may also be represented by an attorney at said oral argument.

8.7.7 New or additional matters not raised during the original hearing or in the hearing committee recommendation, or otherwise considered by the Executive Committee or Governing Body, whichever is appropriate, in making its post Hearing determination, shall be introduced at the appellate review only under unusual circumstances, and the Governing Body or committee thereof appointed to conduct the appellate review shall, in its sole discretion, determine whether such new matters shall be permitted.

8.7.8 If the appellate review is conducted by the Governing Body, after adjournment of such review, it shall, within ten (10) days of such adjournment, affirm, modify or reverse the post Hearing adverse determination, or, in its discretion, refer the matter back to the Executive Committee of the Medical Staff or the Joint Conference Committee, whichever is appropriate, for further review and recommendation. Such referral may include a request that the Executive Committee of the Medical Staff or the Joint Conference Committee, whichever is appropriate, arrange for a further Hearing to resolve specified disputed issues. Such a review and recommendation or Hearing shall be accomplished as soon as may reasonably be possible.

8.7.9 If the appellate review is conducted by a committee of the Governing Body, such committee shall, within 15 days after adjournment of the appellate review, either make a written recommendation recommending that the Governing Body affirm, modify or reverse the post Hearing adverse determination or refer the matter to

8.6.10 The hearing committee may, without special notice, recess the hearing and reconvene the same for the convenience of the participants or for the purpose of obtaining new or additional evidence or consultation. Upon the hearing committee's determination to conclude the presentation of further oral and written evidence the hearing shall be closed. At the close of the hearing, either party may submit a written statement for consideration by the hearing committee. The hearing committee may or thereafter, at a time convenient to itself, conduct its deliberations outside the presence of the parties who participated in the Hearing.

8.6.11 Within 30 days after final adjournment the hearing committee shall make a written recommendation and shall forward the same, together with the hearing record and all other documentation, to the Executive Committee or if the Hearing was before the Joint Conference Committee, to the Governing Body and to the Chief Executive Officer. The recommendation shall include a statement of the basis for the recommendation. A copy of the recommendation shall also be mailed to the practitioner through the Chief Executive Officer by certified mail, return receipt requested, within seven (7) days of such recommendation. The recommendation may recommend confirmation, modification or rejection of the original adverse recommendation of the Executive Committee, summary suspension, or preliminary decision of the Governing Body.

8.6.12 The Executive Committee or the Governing Body, whichever is appropriate, shall consider the recommendation of the hearing committee and any other information deemed pertinent in its reconsideration of the matter at its next regular meeting and shall then make a determination to affirm, modify or reverse its previous recommendation, preliminary decision or, if applicable, imposition of a summary suspension. The determination shall include a statement of the basis for the determination. Written notice of the determination of the Executive Committee or Governing Body, whichever is appropriate, shall be mailed by the Chief Executive Officer to the affected practitioner by certified mail, return receipt requested, within seven (7) days after the making of said determination. If the determination is adverse to the Practitioner, such notice shall advise the Practitioner that he or she shall have thirty (30) days after receipt thereof within which to request an Appellate Review. Such notice shall also advise the Practitioner that failure to request an Appellate Review within such thirty (30) day period shall constitute a waiver of their right to same and that the Governing Body will proceed to a final decision on the matter based on the recommendations, determination and information available.

8.7   APPEAL TO THE GOVERNING BODY

8.7.1 Within 30 days after receipt by an affected practitioner of a notice of an adverse determination made or adhered to after a hearing as above provided, he or she may, by written notice to the Governing Body delivered through the President and Chief Executive Officer by certified mail, return receipt requested, request an appellate review by the Governing Body. Such notice may request that the

## ARTICLE X

### DEPARTMENTS

**10.1 DEFINITION**

All members of the Medical Staff shall hold membership in a clinical Department. The clinical Department is defined as consisting of those members of the Medical Staff who practice the same specialty or sub-specialty; chose to be identified as a Department, have a Chair, hold regular meetings and have appropriate Rules and Regulations for the Department and are designated as a Department, pursuant to these Bylaws. Those specialty or sub-specialty areas not meeting all of these criteria will be sections within a Department.

**10.2 CLINICAL DEPARTMENTS**

10.2.1 The clinical departments of the Medical Staff shall be as follows:

A. Department of Anesthesiology
  i.   Pain Management
B. Department of Cardiac Sciences
  i.   Cardiac Surgery
  ii.  Cardiology
C. Department of Emergency Medicine
D. Department of Family Practice, which may include subsection of:
  i.   Pediatrics
E. Department of Internal Medicine, which may include subsections of:
  i.    Allergy
  ii.   Dermatology
  iii.  Endocrinology and Metabolism
  iv    Gastroenterology
  v.    Hematology/Oncology
  vi.   Infectious Disease
  vii.  Nephrology
  viii. Pulmonary Disease
  ix.   Rheumatology
F. Department of Neurosciences, which may include subsection of:
  i.    Neurology
  ii.   Neurosurgery
  iii.  Physical Medicine and Rehabilitation
  iv.   Psychiatry
G. Department of Pathology
H Department of Radiology, which may include subsections of:
  i.    Diagnostic Radiology
  ii.   Radiation Oncology

---

9.6.4  Treasurer
The Treasurer shall administer to all funds which belong to the Medical Staff.

**9.7 ABSENCE OF MEDICAL STAFF OFFICERS**

In the event that the President of the Medical Staff, Vice President of the Medical Staff, Secretary, and Treasurer are absent at the same time, the immediate Past President of the Medical Staff shall assume all the duties of the President of the Medical Staff. If immediate Past President is not available, the Chair of the Bylaws Committee will then assume those duties.

**9.8 RECALL OF OFFICERS**

See Article 7.9, Removal of Elected Officers and Department Chair.

---

**9.8 DUTIES OF OFFICERS**

9.8.1 The President shall:
A. Serve as the Chief Administrative Officer of the Medical Staff.
B. Preside at Medical Staff functions.
C. Chair the Executive Committee meetings.
D. Enforce the Bylaws, Rules and Regulations of the Medical Staff through the various committees of the Medical Staff.
E. Appoint committee members to all Medical Staff committees except the Executive Committee and other committees whose composition is specifically specified by these Bylaws.
F. Represent the views, policies, needs and grievances of the Medical Staff to the Chief Executive Officer and/or Governing Body.
G. Be a spokesman for the Medical Staff in its external professional public relations.
H. Serve as ex-officio member of all other Medical Staff committees.
I. Serve as the responsible representative of the Medical Staff to receive, understand and interpret the policies of the Governing Body to the Medical Staff.
J. Report to the Chief Executive Officer and/or the Governing Body on the performance and maintenance of the quality of its delegated responsibility to provide medical care.
K. Appoint, in consultation with the Vice President of Medical Affairs, the Intensive Care Unit Medical Directors and assign the responsibilities as delineated in the Medical Staff Rules and Regulations.

9.8.2 Vice-President
In the absence of the President, the Vice President shall assume all the duties and have the authority of the President. The Vice President shall be a member, ex-officio of all committees and shall be Chair of the Credentials Committee and Hospital-Wide Performance Improvement Committee.

9.8.3 Secretary
The Secretary shall be responsible for:
A. In absence President and Vice President, Secretary shall assume all of the duties and have authority of President.
B. Accurate and complete minutes of all meetings.
C. Call meetings on the order of the President.
D. Attend to all correspondence.
E. Performs such other duties as ordinarily pertained to their office.
F. The Secretary shall be the Secretary of the Bylaws Committee.
G. The secretary shall be appointed to membership on the Credentials Committee.

---

## ARTICLE IX

### OFFICERS

**9.1 OFFICERS OF THE MEDICAL STAFF**

The Officers of the Medical Staff shall be:
A. President
B. Vice President
C. Secretary
D. Treasurer

**9.2 QUALIFICATION OF OFFICERS**

Officers of the Medical Staff must be members of the Active Medical Staff for at least 5 years at the time of nomination and election and must remain members in good standing during their term of office. They should have served at least one year as a member of any of the standing committees or the Chair of a clinical Department. Failure to maintain active Medical Staff status immediately shall create a vacancy in the office involved.

**9.3 TERMS OF OFFICE**

The terms of office for Officers of the Medical Staff shall be for one year or until a successor is elected and qualified. The President, Vice President, Secretary and Treasurer may be elected for two consecutive terms. All officers shall take office immediately following the annual meeting of the Active Medical Staff.

**9.4 ELECTION**

Officers of the Medical Staff shall be elected at the annual meeting of the Medical Staff. Only members of the Active Medical Staff shall be eligible to vote.

**9.5 VACANCIES**

Except for the presidency, vacancies in office during the Medical Staff year shall be filled by the Executive Committee. If there is a vacancy in the office of the President, the Vice President shall assume the office for the remainder of the term. The Vice President would then be eligible to serve one full term and stand for one re-election.

## ARTICLE XI

## COMMITTEES

### 11.1  ORGANIZATION OF COMMITTEES

11.1.1 Committees shall either be standing or special. All standing committees shall be appointed and take office within thirty (30) days following the annual meeting of the Active Medical Staff and shall continue until the new committee membership is appointed.

11.1.2 Unless otherwise specified, all Medical Staff Committees and their Chairs shall be appointed by the President of the Medical Staff after consultation with the Chief Executive Officer and subject to the approval of the Executive Committee, except for the Joint Conference Committee and the Executive Committee.

11.1.3 Each Committee shall meet at least once quarterly, unless more frequent meetings are specified or deemed appropriate to conduct business and shall submit an annual written report to the Executive Committee and Active Staff.

11.1.4 A quorum of any Committee shall consist of the voting members present, provided the Committee meets at the date and time established on its annual calendar or one (1) week notice is provided for special meetings. A quorum being present, any and all actions of the committee shall be decided by a majority of the members present, not withstanding withdrawal of some of the members.

11.1.5 On request by the Chair of any committee, the Chief Executive Officer may designate a member of the Administration to act as secretary.

### 11.2  STANDING COMMITTEES OF THE MEDICAL STAFF

11.2.1 Medical Staff Executive Committee

    A.    The voting members of the Executive Committee shall consist of:
        i.    President
        ii.    Immediate Past President
        iii.    Vice President
        iv.    Secretary
        v.    Treasurer
        vi.    Chair of each Medical Staff Department or their designee, subject to approval of the Chair. The designee shall not vote nor attend more than two consecutive meetings.
        vii.    One (1) additional member from the Department of Surgery and Department of Medicine

10.6.10 Assist in the preparation of such annual reports, including budgetary planning, pertaining to the Department, as may be required by the Executive Committee, the Chief Executive Officer or the Governing Body;

10.6.11 Be responsible for supervision and proper functioning of the resident training program in the Department.

### 10.7  FUNCTIONS OF DEPARTMENT

10.7.1 Each Department may establish its own criteria, consistent with the policies of the Medical Staff and of the Governing Body, for the granting of clinical privileges and for the holding of office in the Department. Such department criteria for granting clinical privileges shall:
    A.    Be submitted to the Executive Committee for approval.
    B.    Should be in writing.

10.7.2 Each Department may make its own Rules and Regulations which shall not be inconsistent with these Bylaws. Such Rules and Regulations are subject to the approval of the Executive Committee and the Governing Body.

10.7.3 Each Department shall meet periodically, as proposed by the department membership and approved by the Executive Committee, to review and evaluate the care, treatment and services rendered to the patients served by the Department. Written minutes of these meetings shall be made and shall become part of the records of the Medical Staff.

10.7.4 There shall be a meeting annually of each Department in which the prospective Department leadership shall be chosen.

election of each Department Chair shall be subject to approval by the Governing Body. Section heads shall be appointed by the Chair of the Department concerned. If the same individual is nominated for a fourth consecutive term or more, a second nominee must be offered to the Department when feasible.

10.5.4 Any Department Chairmanship that becomes vacant during the Medical Staff year shall be filled on an interim basis by the President of the Medical Staff until a successor can be elected by the Department. The individual elected shall be subject to approval by the Executive Committee at its next meeting.

### 10.6  FUNCTIONS OF DEPARTMENT CHAIRMEN

Each Chair shall:

10.6.1 Be accountable for all professional and administrative activities within the Department;

10.6.2 Be a member of the Executive Committee, giving guidance on the overall medical policies of the Medical Center and making specific recommendations and suggestions regarding the Department in order to assure quality patient care;

10.6.3 Maintain continuing review of the professional performance of all practitioners with clinical privileges in the Department and report regularly thereon to the Executive Committee;

10.6.4 Appoint a departmental committee to conduct the initial phase of peer review required by these Bylaws;

10.6.5 Be responsible for the enforcement of the Medical Center's Bylaws and of the Medical Staff's Bylaws, Rules Policies and Regulations within the Department;

10.6.6 Be responsible for implementation within the Department of actions taken by the Executive Committee of the Medical Staff;

10.6.7 Transmit to the Executive Committee the department's recommendations concerning the staff classification, the reappointment and the delineation of clinical privileges for all practitioners in the Department;

10.6.8 Be responsible for the teaching, education and research programs of the Department;

10.6.9 Participate in every phase of administration of the Department through cooperation with the nursing service and the Medical Center administration in matters affecting patient care, including personnel, supplies, special regulations, standing orders and techniques;

    i.    Department of Surgery, which may include subsections of:
        i.    Cardiac/Thoracic
        ii.    General
        iii.    Gynecology
        iv.    Ophthalmology
        v.    Oral
        vi.    Orthopedic
        vii.    Otorhinolaryngology
        viii.    Plastic
        ix.    Trauma
        x.    Urology
        xi.    Vascular
        xii.    Others

### 10.3  FUTURE DEPARTMENTS

The Executive Committee, subject to approval by the Active Medical Staff at its next meeting, and the Governing Body, may create, eliminate, sub-divide, further sub-divide, or combine departments. Any such changes shall be reflected in the Bylaws.

### 10.4  ASSIGNMENT TO DEPARTMENTS

Each member of the Medical Staff shall be assigned membership in only one Department by the Medical Staff and the Governing Body but may be granted clinical privileges and attendant responsibilities in one or more departments. Responsibilities for determining qualifications being within the departments.

The Executive Committee shall make the departmental assignments of the Medical Staff members based upon recommendations received from the specific Department through the Credentials Committee.

### 10.5  ORGANIZATION OF DEPARTMENTS

10.5.1 Each Department shall be organized as part of the Medical Staff and shall have a Chair, who is responsible to the Chief of Staff and the Executive Committee for the function of the Department and shall have general supervision over the clinical work within the Department.

10.5.2 The Departments of Medicine and Surgery each shall elect a Member-At-Large to the Executive Committee.

10.5.3 The Chair of each Department shall be an Active Medical Staff member and be a member qualified by training, experience and demonstrated ability for the position. The Chair of each Department shall be elected annually by members of the Department with approval of the Executive Committee and Active Staff. The

**11.2.5    Bylaws and Policies Committee**

A. Composition - The Bylaws and Policies Committee shall be composed of at least four Active Medical Staff members appointed by the President of the Medical Staff and approved by the Executive Committee. In addition, the Secretary of the Medical Staff shall serve as Secretary of the Bylaws Committee and shall be a voting member. The Chief Executive Officer or his designee shall also be a voting member of the Bylaws Committee. Other non-voting members may be appointed by the President of the Medical Staff in consultation with the Chief Executive Officer.

B. Duties - The Bylaws Committee is responsible for:
   i. Recommend changes in the Medical Staff Bylaws and Policies,
   ii. Interpretation of the Bylaws and Policies if requested by the Executive Committee,
   iii. Preparation of new or revisions of previous Policies or Bylaws.
   iv. Review the entire Medical Staff Bylaws, within a "two-year period of time.

C. Meetings  - The Committee shall meet as necessary, at least semi annually, to perform its assigned duties.

**11.3  MULTIDISCIPLINARY COMMITTEES INVOLVING MEDICAL STAFF**

**11.3.1 Medical Records Committee**

A. Composition - The Medical Records Committee shall consist of:
   i. At least two members of the Medical Staff, one of whom shall serve as Chair of the Committee.
   ii. One Nursing representative,
   iii. One Medical Center management representative and
   iv. The Health Information Management Department Administrator will act as secretary. All of these shall be voting members.

B. Duties - The Medical Record Committee shall be responsible for:
   i. Evaluation of the timeliness, clinical pertinence and overall adequacy of the medical record for use in patient care and evaluation studies.
   ii. Establishment of the medical record format, the additions/deletions of forms and process for record storage and preservation.
   iii. Application of above as it pertains to all patient care programs medical records.
   iv. Recommend medical staff policies for medical records.
   v. Declaring a medical record complete.
   vi. Meet the current requirements of JCAHO, Michigan Department of Community Health (MDCH), Michigan Department of Mental Health (MDMH) and other accrediting, licensing or regulatory agencies.

---

**11.2.3 Medical Staff Performance Assessment and Improvement**

A. Composition - The Medical Staff Performance Assessment and Improvement Committee shall be composed of at least four members of the medical staff, chosen to represent broadly the various disciplines of the medical staff and for their interest in quality issues. The Secretary of the Medical Staff shall serve as one of the Medical Staff members of the Committee. The Vice President for Medical Affairs is a fifth physician member and serves as the Chair of the Committee. Selected staff members of Saint Mary's Quality Resources Department will serve on the committee, ex officio without a vote.

B. Duties – The Medical Staff Performance Assessment and Improvement Committee reviews all quality assurance and quality improvement activities originating from activities of the Medical Staff and from multidisciplinary committees monitoring medical staff quality activities. The MSPAI trends data and rates, compares results to known benchmarks and performance targets, and initiates actions to investigate situations where trends and activities may point to quality concerns. The MSPAI reports the results of its findings to the Executive Committee, the Hospital Wide Performance Improvement Committee, the Joint Conference Committee and the Board of Directors, as well as relevant Departments of the Medical Staff. The MSPAI reviews the results of each Department's performance assessment and improvement process. The MSPAI makes recommendations to improve the quality of care rendered by the Medical Staff. The MSPAI may charter performance improvement teams as required to improve quality of care processes involving the Medical Staff.

C. Meetings – The Committee shall meet as required but not less than every other month.

**11.2.4 Nominating Committee**

A. Composition -  The Nominating Committee shall be composed of five Active Medical Staff members appointed by the President of the Medical Staff with approval of the Executive Committee. The Chief Executive Officer shall be an ex-officio member.

B. Duties - The Nominating Committee shall compose a list of at least one nominee for each medical staff office selected from the Active Staff. This list, in addition to the elected Department chairmen, shall be presented to the Executive Committee for its approval. Following Executive Committee approval, the list, in addition to the elected Department Chairmen, shall be mailed to members of the Active Staff prior to the annual Active Medical Staff meeting. Additional nominations may be made from the floor during the annual Active Medical Staff meeting and the elections shall be by written ballot.

C. Meetings
   The Committee shall meet as required to carry out its duties.

---

   xv. To oversee the role of the Medical student and  resident training program as it relates to Medical Center and the Saginaw Cooperative Hospital, Inc.;
   xvi. To serve as a review board to consider the effectiveness of the medical student-training program at Medical Center and  to keep the Medical Staff informed of  changes and  accreditation requirements and philosophy of medical education;
   xvii. To report at each general Active Staff meeting.

D. Meetings  - The Executive Committee shall conduct at least ten (10) monthly meetings throughout the year and maintain a permanent record of these proceedings and actions.

**11.3.2 Credentials Committee**

A. Composition - The Credentials Committee shall consist of a minimum of seven Active Medical Staff members, two of which shall be the Vice President and Secretary of the Medical Staff. The Vice President and Secretary of the Medical Staff shall be the only members of the Executive Committee serving on the Credentials Committee. The active medical staff members shall be the voting members of the Committee. The Chief Executive Officer of the Medical Center shall appoint at least one non-voting administrative representative to the Credentials Committee.

B. Selection of Members
   Voting members of the Credentials Committee shall be appointed by the President of the Medical Staff, subject to the approval of the Executive Committee. In the event of a vacancy occurring on the Committee the President of the Medical Staff shall appoint a replacement to serve out the remainder of the term.

C. Term of Office
   Each member of the Credentials Committee may be re-appointed annually by the President of the Medical Staff for an indefinite number of one-year terms

D. Duties - The duties of the Credentials Committee shall be:
   i. To review and investigate the credentials of all applicants for staff membership and to make recommendations to the Executive Committee in compliance with these Bylaws;
   ii. To review all information available regarding the competence of staff members and, as a result of such reviews, to make recommendations for the granting, denying or suspension of privileges, reappointments and the assignment of members to the various services and departments as provided in these Bylaws;

E. Meetings  - The Credentials Committee shall meet at least quarterly and shall maintain a permanent record of its proceedings and actions.

---

   vii. One (1) additional member, appointed by the President of the Medical Staff, who has previously served as President of the Medical Staff

B. The non-voting members of the Executive Committee shall consists of:
   iv. Chief Executive Officer
   iv. Chief Operating Officer
   v. Governing Body Representative
   vi. Vice President of Nursing
   vii. Vice President of Medical Affairs.

C. Duties - The duties of the Executive Committee shall be:
   i. To represent and act on behalf of the Medical Staff, subject to such limitations as may be imposed by these Bylaws;
   ii. To be the only committee authorized to take direct executive action on any matter;
   iii. To coordinate the activities and general policies of the various departments;
   iv. To receive and act upon committee reports;
   v. To implement policies of the Medical Staff not otherwise the responsibility of the Department;
   vi. To provide liaison between Medical Staff and the Chief Executive Officer and the Governing Body;
   vii. To recommend action to the Chief Executive Officer on matters of medico-administrative nature;
   viii. To make recommendations to the Governing Body through the Chief Executive Officer;
   ix. To fulfill the Medical Staff's accountability to the Governing Body for the medical care rendered to patients in the Medical Center;
   x. To ensure that the Medical Staff is kept abreast of the accreditation program and informed of the accreditation status of the Medical Center;
   xi. To provide for the preparation of all meeting programs either directly or through delegation, to a program committee or other suitable agent;
   xii. To review the credentials of all applications and to make recommendations for staff membership, assignments to Department and delineation of clinical privileges;
   xiii. To review periodically all information available regarding the performance and clinical competence of staff members and other practitioners with clinical privileges and as a result of such reviews to make recommendations for reappointments and renewal of changes in clinical privileges;
   xiv. To take all reasonable steps to ensure professional ethical conduct and competent clinical performance on the part of all members of the Medical Staff, including the initiation of and/or participation in Medical Staff corrective or review measures when warranted;

B. Duties

The Cancer Committee shall supervise or assure:

i. Quality of care given to cancer patients.
ii. The tumor registry for quality control, abstracting, staging and reporting.
iii. Short-term and long-term studies.
iv. Regular Cancer Conferences
v. An annual report on the Medical Center's cancer program for distribution to the Medical Staff and Governing Body.

C. Meeting - The Committee shall meet at least quarterly as a policy making body with written report of the Committee's activities submitted to the Hospital-Wide Performance, Assessment and Improvement Committee and the Executive Committee for a permanent record.

### 11.3.6 Physician Health and Well-Being Committee

A. Composition - The Physician Health and Well-Being Committee shall be composed of physicians appointed by the President of the Medical Staff for one-year terms. Number of physicians and number of terms served are unlimited. Appointed members may be removed and vacancies filled by the President of the Medical Staff.

B. Function – The function of the Committee shall be to serve as an ongoing review entity and to provide a confidential mechanism for identification, confrontation, rehabilitation and monitoring of practitioners who may have health or well-being issues.

The specific duties of the Committee shall be to:

1. Investigate all reports of suspected impairment and act in accordance with the findings; and
2. Maintain confidential records which are neither public records nor subject to court subpoena.
3. Provide a statistical annual report of the Committee's activities.

C. Meetings - The Committee shall meet as necessary and report directly to the President of the Medical Staff.

---

a. Duties - The Committee shall:

i. Receive, review and recommend to the Executive Committee approval or disapproval of any new uses of radioactive material.
ii. Receive and review reports from the radiation protection officer of any untoward incidents in the use of radioactive materials or sources of radiation.
iii. Conduct appropriate investigation of such incidences or of questionable practices involving radiation and make recommendations to the Executive Committee.
iv. Serve in a consulting role in the Medical use of radionuclides in the Medical Center when necessary.

C. Meetings - This Committee shall meet at least quarterly.

### 11.3.5 Tissue and Blood Committee

A. Composition - The Committee shall include:

i. Pathologist, who shall chair the Committee
ii. At least two Representative members from Surgery, Anesthesia or Emergency Department.
iii. One representative appointed by the Chief Executive Officer. All of the above members shall be voting members. The Quality Resources Department and the Blood Bank shall provide staff support to the Committee.

B. Duties - The Committee shall:

i. Evaluate invasive procedures performed to procure diagnostic tissue specimens or to resect tissue for palliation or cure and usage of blood and blood components disease.
iii. Define problems, recommend actions, or referral to appropriate committees or Departments seeking opportunities to improve the functions stated.

C. Meetings - The Committee shall meet at least quarterly or as required to carry out the duties. The Committee shall perform Blood review quarterly. A written report shall be maintained to reflect the results of all evaluation performed and actions taken. Reports shall be submitted to the Medical Staff Performance, Assessment & Improvement Committee and Executive Committee.

### 11.3.7 Cancer Committee

A. Composition - The Cancer Committee shall consist of at least:

i. One medical representative from each clinical department including Oncology and Radiation Therapy. This committee will include Medical Center personnel representing Nursing, Social Service, Physical Therapy, Occupational Therapy, Education, Resources, Quality Assessment, Administration and Tumor Registry.

---

The Pharmacy Director shall act as secretary of the Committee. A physician member of the Committee shall act as the Chair. All of the above members will be voting members of the Committee.

B. Duties -The Committee shall be responsible for:

i. Development and surveillance of all drug utilization policies and practices in order to assure optimum clinical results and minimum potential for hazard.
ii. Development and surveillance of the provision of nutritional care in a timely, effective and efficient manner.
iii. Assistance in the formulation of policies regarding the evaluation, appraisal, selection, procurement, storage, distribution, use, safe procedures and all other matters relating to drugs and nutritional products in the Medical Center.
iv. Establishment of a Medical Formulary of accepted drugs and nutritional products.
v. Perform the following specific functions:

a. Advise the staff and the Director of Pharmacy on matters pertaining to the choice of drugs.
b. Recommend additions to and deletions from the Formulary.
c. Prevent unnecessary duplication in the Formulary.
d. Recommend drugs and nutritional products to be stocked on the nursing floors and other services.
e. Evaluate clinical data concerning new drugs and nutritional products or preparations requested or used.
f. Document and evaluate adverse drug reactions.
g. Identify potential drug-nutrient interactions
h. Meetings - The Committee should meet at least quarterly and shall maintain a record of its proceedings and activities and shall report quarterly thereon to the Hospital-Wide Performance, Assessment and Improvement Committee and the Executive Committee.

### 11.3.5 Radiation Safety Committee

A. Composition - The Radiation Safety Committee shall be composed of:

i. Radiation Protection Officer of the Medical Center.
ii. At least two physicians, at least one from Radiation Oncology and one from Diagnostic Radiology.
iii. One Administration representative appointed by the Chief Executive Officer.

All of the above members shall be voting members of the Committee. A physician shall serve as Chair of the Committee.

---

e. The definition of what constitutes a patient stay of extended duration;
f. The relationship of the utilization review plan to claims administration by a third party;
g. Arrangements for committee reports and their dissemination.

C. Meetings - The Utilization Review Committee shall meet at least quarterly or as required to carry out its duties and responsibilities, shall maintain a permanent record of its findings, proceedings and actions and shall make a report thereof to the Hospital-Wide Performance, Assessment and Improvement Committee and the Executive Committee.

### 11.3.3 Infection Control Committee

A. This committee shall consist of at least:

i. One Active Medical Staff member,
ii. One Nursing member,
iii. Environmental Services Director
iv. One Administration representative and
v. The committee shall be chaired by the physician member. All of the above members will be voting members.

B. Duties - The Infection Control Committee shall:

i. Be responsible for the surveillance of inadvertent Medical Center infections and potential infections.
ii. Review and analyze actual infections.
iii. Promote preventative and corrective program designed to minimize infection hazards.
iv. Supervise Infection Control in all phases and areas of the Medical Center's activities.

C. Meetings - This Committee shall meet at least quarterly and shall maintain a record of its proceedings and activities and shall report quarterly thereon to the Hospital-Wide Performance, Assessment and Improvement Committee and the Executive Committee.

### 11.3.4 Pharmacy, Therapeutics and Nutrition Committee

A. Composition - The Pharmacy, Therapeutics and Nutrition Committee shall consist of at least:

i. At least one Active Medical Staff member from the Department of Medicine, Anesthesiology or Surgery.
ii. The Pharmacy Director
iii. Nursing representative
iv. Administration representative
v. Clinical Pharmacist
vi. Clinical Dietitian

13.6.  RIGHTS OF EX-OFFICIO MEMBERS

Persons serving under these Bylaws as ex-officio members of a committee or Department shall have all rights and privileges of regular members except they shall not be counted in determining existence of a quorum nor shall they have the right to vote.

13.7  MINUTES

Minutes of each regular and special meeting of the committee or Department shall be prepared and shall include a record of the attendance of members and the vote taken on each matter. The minutes shall be signed by the presiding officer and a copy shall be submitted to the Executive Committee. Each committee and Department shall maintain a permanent file of the minutes of each meeting.

13.8  ATTENDANCE REQUIREMENTS

A.  Each Department or committee of the medical staff shall establish its own requirements for meeting attendance and the penalty for failure to meet the attendance requirements.

---

## ARTICLE XIII

### COMMITTEE AND DEPARTMENT MEETINGS

13.1.1 REGULAR MEETINGS

Committees may, by resolution, set the dates and time for holding their regular meetings without other notice than such resolution. In no event shall such meetings be fewer than the minimum required by these Bylaws.

13.1.2 Departments shall hold regular meetings as determined by the Department and approved by the Executive Committee and approved by the Executive Committee to review and evaluate the clinical work of practitioners with privileges in the Department.

13.2  SPECIAL MEETINGS

Special meetings of any committee or Department may be called by the departmental Chair or committee Chair, President of the Medical Staff or by one-third of membership of the committee or Department, but not less than two members.

13.3  NOTICE OF MEETINGS

Written or oral notice stating the place, day and hour of any special meeting or any regular meeting not held pursuant to resolution shall be given to each member of the committee or Department not less than five business days before the time of such meeting by the person or persons calling the meeting. The notice may be placed on the bulletin board near the active medical staff mailboxes, or if mailed, the notice of the meeting shall be deemed delivered when deposited in the U.S. Mail addressed to the members at their addresses as they appear on the records of the Medical Center with postage thereon prepaid. The attendance of a member at a meeting shall constitute waiver of notice of such meeting.

13.4  QUORUM

Two voting members present at a regularly scheduled or special committee or Department meeting shall constitute a quorum.

13.5  MANNER OF ACTION

13.5.1 The action of a majority of the members present at a meeting at which a quorum is present shall be the action of a committee or Department.

13.5.2 Action may be taken without a meeting by unanimous consent in writing on a document, setting forth the action so taken and signed by each member entitled to vote.

---

12.6  AGENDA

12.6.1 The agenda for regular Active Medical Staff meetings shall be:
A.  Call to Order.
B.  Approval of Agenda.
C.  Reading the minutes of the last regular and all special meetings.
D.  President of the Medical Staff Report
1.  Correspondence and Announcements.
E.  Administration Report
1.  President-CEO and/or COO, who will bring reports or requests, if any from the Board of Directors
2.  Senior Vice President Patient Care
3.  Vice President Medical Affairs
F.  Committee Reports
G.  Unfinished Business
H.  New Business
I.  Reports of Departments
J.  Adjournment.

12.6.2 Agenda for Special Meetings
A.  Call to Order.
B.  Reading of the notice of calling for the meeting.
C.  Transaction of the business for which the meeting was called.
D.  Adjournment.

---

## ARTICLE XII

### MEDICAL STAFF MEETING

12.1 ANNUAL MEETINGS

The annual meeting of the Active Medical Staff is held at St. Mary's Medical Center on the second Friday of January, at 12:00 noon, unless the Executive Committee or President of the Medical Staff shall determine otherwise and notify not less than ten (10) days prior to the date of any such meeting. The agenda of such meeting shall include the annual reports of the work done in the clinical departments, committees involving Medical Staff and performance of the required Medical Staff functions. The retiring officers shall make such reports as may be desirable, and officers for the ensuing year shall be elected.

12.2  REGULAR MEETINGS

There shall be at least four regular Active Staff meetings a year, including the Annual Staff meeting in January. All regular meetings shall be held at such day and hour, as the President of the Medical Staff shall designate in the call and notice of the meeting. The Executive Committee may provide by resolution for the holding of additional regular meetings of the Medical Staff for the purpose of transacting such business that may come before the meeting.

12.3  SPECIAL MEETINGS

Special meetings of the Active Medical Staff may be called by the Chief Executive Officer, the President of the Medical Staff or at the request of any five members of the Active Medical Staff. At any special meeting no business shall be transacted except that stated in the notice calling the meeting. Notice of special meetings shall be posted on the bulletin board near the active medical staff mailboxes at least five weekdays before the time set for the special meeting.

12.4  MINUTES

The minutes of each regular or special Active Medical Staff meeting shall be transmitted by the Secretary of the Medical Staff to the Executive Committee and the Governing Body through the President & Chief Executive Officer.

12.5  QUORUM

At any regular or special meeting of the Active Medical Staff, Active Staff members present shall constitute a quorum. A quorum being present, any motion shall be decided by a majority of the members voting on said motion.

## ARTICLE XVI

## AMENDMENTS

16.1   MEDICAL STAFF RESPONSIBILITY AND AUTHORITY

The Medical Staff has the initial responsibility and the delegated authority to formulate, adopt and recommend its Bylaws and amendment thereto, which will be effective when approved by the Governing Body. Such responsibility and authority will be exercised in good faith and in a reasonable, timely and responsible manner reflecting the interest of providing quality patient care and maintaining a harmony of purpose and effort among the Medical Staff, the Administration, Governing Body and community. These Bylaws shall be reviewed by the Bylaws Committee every two (2) years.

16.2   AMENDMENT PROCEDURE

These Bylaws may be amended in the manner described below.

16.2.1 Origination

Proposed changes shall be directed to the Bylaws Committee and may originate by one of the following means:
A.   Request for Bylaw change may originate in the Executive Committee.
B.   Request for Bylaws changes may originate in the Governing Body.
C.   A request may be directed from the President of the Medical Staff, usually upon approval by the Executive Committee.
D.   Request may originate in the Bylaws Committee itself.
E.   A written request from a voting member for a Bylaws change may be forwarded directly to the Bylaws Committee, when accompanied by ten supporting signatures of members of the voting Active Medical Staff.
F.   Written request from a voting member of the Medical Staff for a Bylaw change may be made at the Annual Active Staff meeting and supported by the majority of those eligible voters present, but not less than one-third of the total voting membership.

16.2.2   All proposed amendments shall be reviewed by the Bylaws Committee, which shall report out the proposed changes to the Executive Committee. The report shall include a recommendation to either approve or disapprove a proposed amendment. It may also suggest changes in the proposed amendment.

16.2.3   Action by the Executive Committee
The Executive Committee will consider the proposed changes and will either return the proposed amendment to the Bylaws Committee for

## ARTICLE XV

## POLICIES, RULES AND REGULATIONS

15.1   The Executive Committee shall have the power to adopt such Policies, Rules and Regulations, consistent with these Bylaws, as may be deemed advisable for the proper conduct of the work of the Medical Staff and the various committees thereof subject, however, to the approval of the Governing Body. The Executive Committee shall have the power to modify, amend or repeal any Rule or Regulation at any meeting of the Executive Committee and such change shall become effective when approved by the Governing Body.

G.   That the consents, authorizations, releases, rights, privileges and immunities, provided in Article V of these Bylaws for the protection of Medical Staff members, other appropriate Medical Center officials and personnel and third parties, in connection with applications for initial appointment, shall also be fully applicable to the activities and procedures covered by this Article XIV

## ARTICLE XIV

## IMMUNITY FROM LIABILITY

14.1   The following shall be express conditions to any application for, or exercise of staff membership or clinical privileges at the Medical Center.
A.   That any act, communication, report, recommendation or disclosure with respect to any such applicant, performed or made in good faith and without malice, and at the request of an authorized representative of this or any other health care facility, for the purpose of achieving and maintaining quality patient care in this or any other health care facility, shall be privileged to the fullest extent permitted by law.
B.   That such privilege shall extend to members of the Medical Center's Medical or allied health professional affiliate staff and of its Governing Body, its Chief Executive Officer and their representatives, and to third parties, who supply information to any of the forgoing authorized to receive, release or act upon the same. For the purpose of this Article XIV, the term "third parties" means both individuals and organizations from whom information has been requested by an authorized representative of the Governing Body or of the Medical Staff.
C.   That there shall, to the fullest extent permitted by law, be immunity from civil liability arising from any such act, communication, report, recommendation, or disclosure, even where the information involved would otherwise be deemed privileged.
D.   That such immunity shall apply to all acts, communications, reports, recommendations or disclosures performed or made in connection with this or any other health care institution's activities related, but not limited to: (a) applications for appointment or clinical privileges, (b) periodic reappraisals for reappointment or clinical privileges, (c) corrective action, including summary suspension, (d) hearings and appellate reviews (e) medical care evaluations, (f) utilization reviews and (g) other Medical Center, departmental, service or committee activities related to quality patient care and professional conduct.
E.   That on acts, communications, reports, recommendation and disclosures referred to in this Article XIV may relate to an applicant's professional qualifications, clinical competency, character, mental or emotional stability, physical condition, ethics or any other matter that might directly or indirectly have an effect on patient care.
F.   That in furtherance of the foregoing, each applicant shall, upon request of the Medical Center, execute a release in accordance with the tenor and import of this Article XIV in favor of the individuals and organizations specified in Paragraph B subject to such requirements, including those of good faith, absence of malice and the exercise of a reasonable effort to ascertain truthfulness, as may be applicable under the laws of the State of Michigan.

## ARTICLE XVII

### ADOPTION

17.1   These Bylaws, shall be adopted at any regular or special meeting of the Active Medical Staff, shall replace any previous Bylaws and shall become effective when approved by the Governing Body of the Medical Center.

_____
President of the Medical Staff

_____
Secretary of the Medical Staff

APPROVED By the Governing Board on _July 12, 2002_

_____
Chair of the Governing Board

16.2.4   Action by the Active Medical Staff
Notice of a first reading of any amendment proposal will be given to the Active Medical Staff through publication of an agenda for the regularly scheduled or specially scheduled Active Medical Staff meeting. A copy of the proposed amendment will be sent to the Active Medical Staff at least ten (10) days prior to the scheduled regular or special meeting. The first reading will be for discussion. Action may then be taken at the next regularly scheduled Active Medical Staff or special Active Medical Staff meeting again following notice by agenda. Approval of the proposed amendment shall require an affirmative vote of two thirds of the Active Medical Staff present.

16.2.5   Action by the Governing Body
Amendment so made shall be effective when approved by the Governing Body.

further consideration or place the proposed amendment on the agenda for a regular or special Active Staff Meeting. The Executive Committee will provide its recommendation for either approval or disapproval.

# MEDICAL STAFF CREDENTIALING AND PRIVILEGING MANUAL

St. Mary's Medical Center of Saginaw, Inc.

June 2002
Revised: August 2004

## 1.2   APPLICATION CONTENT

Every application for appointment by an applicant, must furnish complete information concerning the following and such other information as is relevant, including the following:

### 1.2.1   Education

Under-graduate and post-graduate training, including the name of each institution, degrees granted, programs completed, dates attended and dates of graduation.

### 1.2.2   Licensure

All currently valid unrestricted medical or other professional licenses or certifications, Drug Enforcement Administration (DEA) Registration and Michigan Controlled Substance Certificate with the date and number of each.

### 1.2.3   Board Status

Specialty and/or sub-specialty board qualification, certification and re-certification, as required by the appropriate board and the bylaws of the Medical Staff.

### 1.2.4   Health

Past or present physical, mental or behavioral health impairments, if any, that do or may effect the applicants skill, attitude, judgement or ability to fully perform professional and Medical Staff duties; any hospitalizations or other institutionalizations for health problems during the past three year period; and/or any continuing health problems requiring current treatment. This information should include  all information regarding any history of substance abuse.

### 1.2.5   Professional Review Action/Insurance

Information is required on professional liability claims, history and experience during the past five years, including the names of present and past insurance carriers.   Practitioners shall submit Certificates of Insurance or other evidence of coverage.  If an insurance policy covers more than one individual then the Certificate of Insurance shall name each applicant (not position) who is covered by the particular policy.

## 1.1   APPLICATION FOR INITIAL APPOINTMENT

### 1.1.1   Pre-application Form

### 1.1.2   An application for admission to the Medical Staff shall be given only to a practitioner who has completed and submitted a pre-application form, which establishes that the practitioner:

A.   Has a current valid license to practice medicine, dentistry or podiatry in the State of Michigan or is able to provide proof of a pending application.

B.   Has a current valid DEA Certificate (except Pathologists).

C.   Has professional liability insurance coverage as required under the Medical Staff Policies and Procedures.

D.   Has completed, or will complete within six (6) months, a residency program approved by the Accreditation Council for Post Graduate Medical Education (ACGME) or the American Osteopathic Association (AOA) or has practiced with unrestricted privileges for at least five (5) years at a JCAHO accredited hospital or a hospital certified to receive Medicare funding (or its equivalent in a foreign country).

Verification of all of the above information and documentation by the Chief Executive Officer or designee is required to proceed with filing an application.

### 1.1.2   Application for Appointment

All applications for appointment to the Medical Staff shall be in writing, shall be signed by the applicant, and shall be submitted on the designated form prescribed by the Governing Body after consultation with the Executive Committee.   Prior to the application being submitted, the applicant will be provided a copy of the Ethical and Religious Directives for Catholic Health Care Facilities and appropriate Medical Center policies, the Medical Staff Bylaws, and any accompanying manuals, Rules and Regulations of the Medical Staff and the applicable Department rules and regulations.  Applicant shall acknowledge in writing on the application their responsibility to review the Bylaws and other    documents before submitting an application.



PLAINTIFF'S EXHIBIT

### 1.2.6   Professional Review Action

Professional review actions are based on the competence or professional conduct of an individual. Such actions are defined as conduct that affects or could affect adversely the health, safety or welfare of a patient or patients, and that has affected or may affect adversely the clinical privileges or membership of the physician in a professional society or hospital medical staff

The nature and specifics of any pending or completed action involving denial, revocation, suspension, reduction, limitation, probation, non-renewal or voluntary relinquishment by resignation or expiration of the applicant's:

A.   License or certificate to practice any profession in any state or country

B.   Drug Enforcement Administration (DEA), Michigan Controlled Substance Registration, or other Controlled Substance Registration if applicable.

C.   Membership or fellowship in local, state, or national professional organization.

D.   Specialty or sub-specialty  board certification or qualification.

E.   Faculty membership at any medical or other professional school.

F.   Medical Staff membership status or clinical privileges at any  other medical center, clinic, or health care institution at which privileges have been or currently are held, including information of voluntary or involuntary reduction, limitation or loss of privileges at these institutions.

### 1.2.7   Office Location

Location of offices, names and addresses of other practitioners with whom the applicant is or was associated and the dates of such association, names and locations of any other hospital, clinic, or health care institution or organization where the applicant provides or has provided clinical services with the dates of each affiliation.

### 1.2.8   Department Assignment

Department assignment, Medical Staff category and specific clinical privileges requested.

1.2.9  Criminal History and Background Check

Any current felony charges pending against the applicant and any past felony convictions against the applicant including their resolution, as well as a criminal background check.

1.2.10 Confidentiality

Written acknowledgement of the scope and the extent of the authorization, confidentiality, immunity and release provisions of the Medical Staff Bylaws must be made by the applicant.

1.2.11 Personal References

Application must include the names of at least three individuals who have personal knowledge of the applicant's ability, ethical character, and ability to work cooperatively with others.  The personal references must be willing to provide specific written, substantive comments on these matters upon request from Medical Center or Medical Staff authorities.  Named individuals must have acquired the requisite knowledge through recent observation of the applicant's professional performance over a reasonable period of time, and at least one must have had responsibility for supervision of the applicant's performance (e.g. Department Chair, clinical service Chair, Section Chief, training program director).  Each reference should include a statement on the applicant's current competence, based upon quality assurance studies that document the applicant's experience, results of treatment, and so forth.

1.3  EFFECT OF APPLICATION

The applicant must sign the application submit the appropriate processing fee sign a release from liability and release of information and agree to abide by the Medical Staff Bylaws and Rules and Regulations.   In addition, the applicant by way of submitting a signed application agrees to appear for interviews and to be examined by the Credentials Committee or any other Medical Center committee in regard to the application. The applicant authorizes the Medical Center to consult with any and all members of Medical Staffs of other hospitals with which the applicant has been associated as well as other persons or entities who may have information bearing on their competence and moral and ethical qualifications. The applicant consents to the Medical Center's inspection of records and documents that may be material to evaluate professional qualifications and competence to carry out the clinical privileges requested, as well as, their moral and ethical qualification for staff membership.

1.4.3  Clinical Department and Section Action

The Chair of each Clinical Department in which the practitioner seeks privileges shall review the application and the supporting documentation, and shall forward a report and recommendation to the Credentials Committee.  This report shall state the Clinical Department Chair's assessment of the applicant and state a recommendation to approve or deny, in whole or in part, the application. The report will also state any recommended limitations (e.g. limited scope of clinical privileges).  The Chair of Clinical Section in which the practitioner seeks privileges shall also prepare a written report, which contains similar evaluations and shall forward it to the Clinical Department Chair and Credentials Committee. The Clinical Department Chair or Section Chief may, at their discretion, conduct an interview with the practitioner.  An interview and report to the Credentials Committee by the Vice President for Medical Affairs is required for all applicants.  If the Vice President for Medical Affairs, Clinical Department or Section Chief concludes, in his or her discretion, that he or she is not qualified or able to review an application and submit a recommendation, then he shall so inform the President of the Medical Staff, who shall ask another qualified physician who is a member of the Medical Staff to carry out the duties of the Chair or Section Chief.

1.4.4  Credentials Committee Action

The Credentials Committee must review the application, the supporting documentation, the reports from the Vice President for Medical Affairs, Clinical Department and Section Chair and any other relevant information available to it.  The Credentials Committee shall determine that the applicant has established all the necessary qualifications set forth in Article IV and V of these Bylaws.  At the next regularly scheduled meeting after receipt of the completed application for membership and the supporting documents, the Credentials Committee shall make a written report of its evaluation with recommendations to the Executive Committee, recommending that the applicant be (1) deferred, (2) rejected or (3) provisionally accepted.  The recommendations of each Department within which the applicant seeks clinical privileges shall be made part of the report.  The Credentials Committee may, in its sole discretion, invite the applicant for an informal interview during which the applicant will be given the opportunity to resolve any doubts raised by the Credentials Committee.  Such an informal interview is not a hearing; as such, no hearing rights are availed to either the practitioner or the Credentials Committee.

The applicant releases from any liability all representatives of the Medical Center and its Medical Staff for their sole performed in good faith and without malice in connection with the evaluation of the applicant and the applicants credentials and releases from any liability all individuals and organizations who provide information to the Medical Center in good faith and without malice concerning the applicant's competence, ethics, character and other qualifications for staff appointment and clinical privileges, including otherwise privileged or confidential information.

The terms "Medical Center" and all representatives of the Medical Center and its "Medical Staff" as used in this Section are intended to include the Governing Body, the Chief Executive Officer and their authorized representatives, agents and employees and all members of the Medical Staff who have committee or other responsibility for collecting and/or evaluating the applicant's credentials and/or acting upon their application. The term "character" is intended to include mental and emotional stability.

1.4   APPOINTMENT PROCESS

1.4.1  Applicant's Burden

The applicant has the burden of producing complete and accurate information for a proper evaluation of their experience, training, current competence, demonstrated ability, health status, and any other relevant matter, and of resolving any reasonable doubts about these or any of the qualifications required to obtain the requested membership and clinical privileges.

1.4.2  Verification of Information

The applicant must deliver a completed application together with the appropriate application fee to the Medical Staff Office, which will, in a timely fashion, seek to collect or verify the information in the application. The Medical Staff Office will request information concerning the applicant from the medical and/or other licensing or certifying board and as otherwise regulated by law. The Medical Staff Office will promptly notify the applicant of any problems in obtaining the information required, and it will then be the applicant's obligation to obtain the required information. The applicant shall promptly obtain and provide the requested additional information to the Medical Staff office.  Said information will be due in the Medical Staff office in 10 days from the date of the request or the application will be considered to have been withdrawn.  When the collection and verification of the information is complete, the Medical Staff Office shall transmit the application and all supporting materials to the Chair of each Department in which the applicant seeks privileges.

1.4.5  Executive Committee Action

Upon receipt of the report of the Credentials Committee, the Executive Committee at its next regular session, shall consider the report and recommend to the Governing Body through the Chief Executive Officer, that the application be (1) deferred, (2) rejected or (3) provisionally accepted.  Any recommendations for initial appointments may include probationary conditions relating to privileges.  The reason for the Medical Staff Executive Committee recommendation shall be stated.

A.  When a recommendation is made to defer action for further consideration or investigation, it must be followed-up at the next regularly scheduled meeting by recommendation to accept or reject the applicant.

B.  When the recommendation of the Executive Committee is favorable to the applicant, the Chief Executive Officer shall promptly forward the recommendation, together with all supporting documentation, to the Governing Body.

C.  When the recommendation of the Executive Committee is adverse to the applicant either in respect to appointment or clinical privileges, the Chief Executive Officer shall promptly notify the applicant by certified mail, return receipt requested.   No such adverse recommendation need be forwarded to the Governing Body until after the applicant has exercised or has deemed to have waived their rights to a hearing as provided in Article IX of these Bylaws.

D.  If, after the Executive Committee has considered the report and recommendation of the hearing committee and the hearing record and the Executive Committee's reconsidered recommendation is favorable to the applicant, the application shall be processed in accordance with subparagraph (b) of this Section. If such recommendation continues to be adverse, the Chief Executive Officer shall promptly notify the applicant by certified mail, return receipt requested. The Chief Executive Officer shall also forward such recommendation and documentation to the Governing Body, but the Governing Body shall not take any action thereon until the applicant has exercised or deemed to have waived their right to an appellate review, as provided in Article IX of these Bylaws.

1.4.5  Action On the Application by the Governing Body.

At its next regular meeting after receipt of a favorable recommendation, the Governing Body or its Executive Committee shall act on the matter.  If

the Governing Body decision is adverse to the applicant in respect to either appointment or clinical privileges, the Chief Executive Officer shall promptly notify the applicant of the decision by certified mail, return receipt requested. Such adverse decisions shall be held in abeyance until the applicant has exercised or has been deemed to have waived the rights under the Medical Staff Bylaws and until there has been compliance with subparagraph 1.4.1 (B). The fact that the adverse decision is held in abeyance shall not be deemed to confer privileges where none existed before.

A. At its next regularly schedule meeting after all the applicant's rights under the Bylaws have been exhausted or waived, the Governing Body or the Governing Body's executive committee, shall act in the matter. The Governing Body decision shall be conclusive, except that the Governing Body may defer final determination by referring the matter back to the Medical Staff Executive Committee for further reconsideration. Any such referral back shall state the reasons therefore, shall set a time limit within which a subsequent recommendation to the Governing Body shall be made, and may include a directive that an additional hearing be conducted to clarify issues which are in doubt. At its next regular meeting after receipt of such subsequent recommendation on new evidence in the matter, the Governing Body shall make a decision either to appoint the applicant to the staff or to reject him/her for staff membership. All decisions to appoint shall include a delineation of clinical privileges, which the applicant may exercise.

B. Whenever the Governing Body decision is contrary to the recommendation of the Executive Committee of the Medical Staff, the Governing Body shall submit the matter to the Joint Conference Committee for review and recommendation before making its decision final.

C. Governing Body Final Decision

When the Governing Body's decision is final, it shall send notices of such decision through the Chief Executive Officer to the Secretary of the Medical Staff and to the applicant by certified mail, return receipt requested. If the applicant is accepted, the Chief Executive Officer shall secure a signed agreement to be governed by those Bylaws, Rules and Regulations of the Medical Staff.

1.4.7 Timely Processing of Applications

Applications for Medical Staff membership shall be considered in a timely manner. The following time periods provide a guideline for the routine

processing of applications. Exceptions to the guideline may be made for a good cause. The guidelines are set forth for the purpose of helping the Medical Staff to process applications and shall not create any duty for action to be taken within the specified time frames.

A. The Clinical Section or Department shall issue its report and recommendation within approximately thirty days after all necessary documentation is available.

B. The review and recommendation by the Credentials Committee is to occur at its first meeting after receipt of the Vice President for Medical Affairs, Clinical Department and Section reports, recommendations and all necessary documentation.

C. The review and recommendation of the application by the Medical Executive Committee shall be at its first meeting after receipt of the Credentials Committee report, recommendation and all necessary documentation.

1.4.8 Waiting List for Denials Based on Need or Inability to Accommodate.

When the Governing Body's final decision is to place the applicant's application in a pending status because of lack of Medical Center or community need, or an inability of the Medical Center to provide adequate practice facility, upon written request by the applicant, the application shall be kept in a pending status for one year from the date of the final decision. If during this period the Medical Center decides to reconsider its decision, then the applicant will be promptly informed and shall within ninety days provide such supplemental information as is required to update all elements of the original application. Thereafter, the procedures provided elsewhere in this Section shall apply. The explicit findings regarding patient and community need shall be made by the Governing Body and applied uniformly to all applicants.

1.4.9 Application After Adverse Action or Recommendation

A. Not withstanding any other provisions in these Bylaws, a waiting period shall apply to the following practitioners:

i. An applicant who has received a final adverse action or who withdrew their application or request for membership or privileges following an adverse recommendation.

ii. A former Medical Staff member who has received a final adverse action resulting in termination of Medical Staff membership and privileges or who resigned from the Medical Staff following an adverse recommendation.

iii. A Medical Staff member who is the subject of a final adverse action, or who withdrew their request following an adverse recommendation.

B. A practitioner subject to a waiting period shall not be eligible to reapply for Medical Staff membership and/or clinical privileges for a period of at least twenty-four (24) months from the date the adverse action became final, the date the application was withdrawn or the date the practitioner's resignation became effective, whichever is later. For purposes of this Section, adverse action shall be considered final at the time of completion of: (1) All Hearing, Appellate Review, and other quasi-judicial proceedings conducted by the Medical Center relating to the application and (2) All and all civil litigation proceedings relating to or arising from the application.

C. After the twenty-four (24) month waiting period, the practitioner may submit another application. The practitioner also must furnish evidence that the basis for the earlier adverse action no longer exists. In addition, such application shall not be processed unless the practitioner submits satisfactory evidence that he has complied with all the specific requirements any such adverse action may have included, such as completion of training or proctoring conditions.

D. If a practitioner has misrepresented the truth on his application or at any time during the application process, such practitioner forever may be prohibited from reapplying for Medical Staff membership or clinical privileges. Such prohibition is at the discretion of the Governing Body, but the Executive Committee is not precluded from including such a recommendation in its report.

1.5 RE-APPOINTMENT PROCESS

1.5.1 Schedule for Re-appointment

At least ninety (90) days prior to the expiration date of a member's term of appointment, the Medical Staff Office shall mail a reappointment application to the Medical Staff member. A member may request a change in category or in privileges at any time (except as prohibited in Section 1.4.10) Such a request shall also be reviewed in accordance with the schedule set forth above (Section 1.4.9). At least sixty (60) days prior to expiration date of their Medical Staff appointment, each Medical Staff members shall submit to the Medical Staff Office a completed reappointment application form.

1.5.2 Reappointment Application

The reappointment application shall be in writing on a form prescribed by the Medical Staff and approved by the Governing Body in consultation with the Medical Staff Executive Committee and shall contain detailed information concerning the changes in the applicant's qualifications since his/her last review period. Specifically, the form shall request all of the information and certification requested in the appointment application process as described in Section 1.2, except for information that cannot change over time. The form shall ask whether the applicant requests any change in the Medical Staff status and/or in clinical privileges. A request for change in clinical privileges must be supported by the type and nature of evidence, which would be necessary for such privileges to be granted in an initial application.

If the Medical Staff member's level of clinical activity at the Medical Center is not sufficient to permit the Medical Staff and Governing Body to evaluate their competence to exercise the clinical privileges requested; then the Medical Staff member shall have the burden of providing sufficient evidence of clinical performance at other facilities on a form that may be required by the Medical Staff.

1.5.3 Verification and Compilation of Information

The Medical Staff Office shall, in a timely fashion seek to compile or verify the additional information made available on each reappointment application form and to compile any other material or information deemed important. The information should address, without limitation:

A. Patterns of care and utilization as demonstrated in the finding of quality review, risk management and utilization management activities presented with comparison data from other practitioners with similar practices.

B. Possession of a current unlimited Michigan license to practice medicine, dentistry or podiatry.

C. A current unlimited Controlled Substance license (except for Pathologists)

D. Current professional liability insurance coverage in such amounts that may be required by the Medical Staff Policies and Procedures.

E. Professional liability filing settlements and final judgements since last reappointment.