UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EUGENE CALABRESE, D.O., and
COLONY MEDICAL GROUP, PC,

                Plaintiffs,

                                     Case Number 06-13908-BC
v.                                  Honorable Thomas L. Ludington

ST.  MARY'S OF MICHIGAN,
HEALTH PLUS OF MICHIGAN, INC.,
GEORGE ROLLER, M.D., FAITH
ABBOT, D.O, MEDLY A.  LARKIN, D.O.,
and CHARLES JESSUP, D.O., jointly and
severally,

                Defendants.

_____ /

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND PERMITTING PLAINTIFFS TO AMEND COMPLAINT

The plaintiffs, Dr. Eugene Calabrese (the plaintiff) and Colony Medical Group P.C. (Colony

Medical Group), initiated this action on September 1, 2006 challenging certain actions taken by the

defendants arising out of the defendant hospital's decision to revoke the plaintiff's staff medical

privileges in 2002 and subsequent failure to reinstate those privileges.  Specifically, in his lengthy

five-count complaint, he alleges that the defendants violated both sections one and two of the

Sherman Act, 15 U.S.C. §§ 1, 2, and the Michigan Antitrust Reform Act (count one); breach of

contract between the plaintiff and the defendant hospital; and tortious interference with a business

expectancy against the defendant doctors (count three), defendant Health Plus (count four), and the

defendant hospital (count five).  The plaintiff also seeks exemplary damages with respect to the

tortious interference claims.

The defendants filed a joint motion to dismiss under Federal Rule of Civil Procedure

12(b)(6) on November 3, 2006, to which the plaintiff has responded.  The Court heard oral argument in open court on February 13, 2007.

At the conclusion of the hearing, the Court granted in part and denied in part the defendants' motion.  The Court granted the defendants' motion with respect to violations of sections one and two of the Sherman Act alleged in count one of the plaintiff's complaint and the allegations of tortious interference against defendant Health Plus in count four.   The Court otherwise denied the defendants' motion.

Section one of the Sherman Act declares as illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  The Sixth Circuit has instructed that the plaintiff must demonstrate that the contract, conspiracy, or combination *unreasonably* restrains trade.  *White & White, Inc.  v.  Am.  Hosp.  Supply Corp.*, 723 F.2d 495 (6th Cir. 1983). There are two tests to determine an unreasonable restrain on trade.  *See Lie v. St Joseph Hosp. of Mt. Clements*, 964 F.2d 657, 559-60 (6th Cir.  1992).  The Sixth Circuit has explained those tests as follows:

> The Supreme Court has set out two kinds of analysis to examine whether agreements run afoul of antitrust laws: the first employs a presumption that an agreement is an antitrust violation, thus invoking a per se illegality rule to classify the agreement; the second, called "rule of reason" analysis, "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332 (1982).

> *Per se* violations involve "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *National Soc'y of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978). *Per se* illegal restraints on trade such as boycotts and price fixing do not require proof of market power. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 432-36 (1990). The Supreme Court has justified *per se* rules partially because these rules help a court "avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so

-2-

great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16, n. 25 (1984).

Under the second kind of analysis, the "rule of reason," it is necessary to "evaluate[ ] [the agreement] by analyzing the facts peculiar to the business, the history of the restraint, and the reasons it was imposed . . . . to form a judgment about the competitive significance of the restraint." *National Soc'y of Professional Engineers*, 435 U.S. 679, 692 (1978). In analyzing agreements that are not per se violations of the antitrust laws, the court is looking to whether the action complained of "has the potential for genuine adverse effects on competition," and this analysis usually involves an inquiry "into market definition and market power." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986). The purpose of this "rule of reason" analysis is to discover "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Id.* at 458.

*Ibid.* (some internal citations and quotations omitted). The plaintiff did not contest the application of the latter rule-of-reason test.

As a general rule, antitrust laws are designed to protect competition in the market place as opposed to harm to individual competitors. *See Brown Shoe v. United States*, 370 U.S. 294, 320 (1962). Indeed, the effect on the market of the wrongful action must rise to the level that "it may suppress or even destroy competition" in the relevant market. *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). Not surprisingly, the Sixth Circuit has confirmed that harm to the market is the essential inquiry, not harm to the particular individual competitor. *See Dunn & Mavis ,Inc. v. Nu-Car Driveaway, Inc.*, 347 F.2d 241, 245 (6th Cir. 1982) (reasoning that "[s]ince the complaint does not allege facts suggesting that [the company's] refusal to deal had any significant anti-competitive effect on the market, there is no rule of reason cause alleged); *Lie*, 964 F.2d at 570 (granting summary judgment because "Dr. Lie can only show that he has suffered has suffered economic injury, a loss of personal income. He shows no evidence to suggest an injury to competition in the form of increased costs or reduces supply of services or harm to the consumer");

*Okansen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (granting summary judgment because "[t]he revocation of staff privileges, while undoubtedly impacting adversely on his practice, has not been shown to have had any adverse impact on competition in the relevant market").

Necessarily, the threshold question in any antitrust suit is a definition of the relevant market. According to the Supreme Court, the relevant product market means the line of goods or services reasonably interchangeable in use. *United States v. E.I. de Pont de Nemours & Co.*, 351 U.S. 377, 404 (1954). Additionally, the plaintiff must identify the relevant geographic market, meaning the "area in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Electric Co v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

Thus, once the relevant market has been identified, a plaintiff bringing a claim under section one of the Sherman Act must demonstrate an actual or substantial restraint of trade in that defined market. Stated otherwise, the plaintiff must show that the action complained of "has the potential for genuine adverse effects on competition," and this analysis usually involves an inquiry "into market definition and market power." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460 (1986). Ultimately, the analysis is whether the alleged restraint "is such as may suppress or even destroy competition." *Id.* at 458.

At the hearing, the Court found that the plaintiff, as a threshold matter, had failed to plead sufficient facts directly or inferentially that would identify the relevant geographic market. In fact, the plaintiff suggested many different markets. At one point the complaint described the market as Tri-City area and at another point the plaintiff attempted to limit the market to the defendant hospital and surrounding Saginaw communities. Plainly, definition of the geographic market is critical to the determination of an *unreasonable* effect on competition and whether the defendants posses sufficient

power to create such an effect.  Indeed, at oral argument the plaintiff argued that the fact the he had been excluded from a single hospital and a single HMO (defendant Health Plus) meant that the market was comprised solely of his affected patients, who were HMO participants.

As a result, the plaintiff's factual allegations did not distinguish between harm to him individually and harm to the market overall, even assuming the plaintiff did plead a discernable geographic market.  Nor did the plaintiff's complaint suggest the defendants' market power or capacity to have an effect on competition.  The Court therefore concluded that the plaintiff had not pleaded a viable cause of action under section 1 of the Sherman Act.

The same result obtains for the plaintiff's claims under section 2 of the Sherman Act. Section 2 "prohibits illegal monopolization." *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 613 (6th Cir. 1993).  As the Sixth Circuit has explained, "[i]llegal monopolization consists of (1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Ibid.*  To prove a monopolization claim, the plaintiff must demonstrate (1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success.  *Id.* at 615.  As indicated, there must be a showing that there was a possession of monopoly power, or capacity to monopolize, in the first instance.

The case law is not a model of clarity as to what constitutes actionable monopoly power. *See Colorado Interstate Gas Co. v. Natural Gas Pipeline of Am.*, 885 F.2d 683, 694 n. 18 (10th Cir. 1989) (reasoning that "courts generally require a minimum market share of between 70% and 80%"); *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979) (noting that "where the market share is 75-80% or greater, this should be regarded as a starting point" in assessing

monopoly power); *see Arthur S. Langendfelder, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1429-34 (noting that annual market shares ranging from 19% to 29% were insufficient); *Lectro-Vend Corp. v. Vendo Co.*, 660 F.2d 225, 271 (7th Cir. 1981) (finding a 30% market share insufficient); *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (stating "[d]uring the relevant period, Hilltop's market share declined from approximately 40% to approximately 30%. Given the facts of the case, such a share is not sufficient to establish Hilltop's capacity to monopolize"). However, the Sixth Circuit has reasoned that "[m]arket share alone . . . is not enough to determine a firm's capacity to achieve monopoly. The real test is whether [the company] possessed sufficient market power to achieve its aims." *Ibid.*

Because the plaintiff failed to plead a discernable market and, as noted, has made no showing of the defendants' capacity to affect the overall market, the Court concluded that the plaintiff failed to plead an actionable section 2 violation. However, these deficiencies are not necessarily fatal to the plaintiff's antitrust claims. As the Court noted at the hearing, Federal Rule of Civil Procedure 15 contains liberal provisions for amending a complaint. Fed. R. Civ. P. 15(a) (providing that after a responsive pleading has been served "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires"). Although the defendants believe that the plaintiff can prove no viable "antitrust story," with or without amending, the Court believes that at this stage of the litigation, the plaintiff should be afforded a chance to rectify the noted deficiencies. The Court therefore extended the plaintiff forty-five days to file an amended complaint.

As to the remaining counts, the Court found that the plaintiff had pleaded viable causes of action, with two notable exceptions. First, the plaintiff alleged in count four defendant Health Plus

-6-

tortiously interfered with a business expectancy. Under Michigan law, "[t]he elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff." *Mino v. Clio School Dist*, 255 Mich. App 60, 78; 661 N.W.2d 586 (2003) (citations omitted).  In this case, there appears to be no direct or inferential allegation of wrongful action on part of defendant Health Plus beyond the accusation that it sought to restrain trade in violation of Sherman Act by conspiring to terminate the plaintiff's staff privileges. As a result, the Court granted the defendants' motion to dismiss with respect to count four.

Second, count three alleges tortious interference with respect to the physician defendants. However, as the plaintiff conceded at the hearing, the statute of limitations prevents him for seeking damages for conduct that took place before September 1, 2003.  Many of the allegations in the complaint relate to the doctors' conduct in 2002 with respect to the revocation of the plaintiff's staff privileges at the hospital.  It is unclear from the complaint what role, if any, these doctors had in subsequent decisions to deny the plaintiff's later application for staff privileges in 2004 and 2005, and the defendants were unwilling to disclose their roles, if any, at the hearing.  The Court therefore concluded that the plaintiff should include in his amended complaint the actionable conduct of the defendant doctors after September 1, 2003, but after the plaintiff has an opportunity to learn who the participants were in discovery.

Finally, the court concluded that the plaintiff properly might seek exemplary damages with respect to the tort causes of action.  *See Joba Const. Co., Inc. v. Burns & Roe Inc*., 121 Mich.App.

615, 642 ,329 N.W.2d 760, 765 (1982) (reasoning that "[a]lthough it is true that, as a general rule, exemplary damages will not be awarded to compensate a purely pecuniary grievance susceptible to full and definite monetary compensation, in the case at bar, the damage inflicted upon plaintiff was not susceptible to precise and definite measurement. In addition to suffering lost profits, which are inherently incapable of precise measurement, plaintiff may well have suffered injury to its reputation as a skillful and competent construction company").

Accordingly, it is **ORDERED** the defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** for the reasons stated on the record and in this order.

It is further **ORDERED** that the plaintiff may file an amended complaint to correct the deficiencies noted above.  The plaintiff shall file the amended complaint, if any, on or before **April 17, 2007**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 15, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 15, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS

-8-